947 F.2d 1034
 138 L.R.R.M. (BNA) 2697, 60 USLW 2323,
120 Lab.Cas. P 10,998
 LOCAL 812, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,
AFL-CIO, (CANADA DRY DISTRIBUTORS
ASSOCIATION OF NEW JERSEY),
Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
 Nos. 59, 276, Dockets 91-4048, 91-4062.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 27, 1991.
Decided Oct. 30, 1991.
 
 Sidney Fox, New York City (Gerald Richman, Shapiro, Shiff, Beilly, Rosenberg & Fox, of counsel), for petitioner-cross-respondent.
 Robert N. Herman, Washington, D.C. (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles P. Donnelly, Jr., Supervisory Atty., N.L.R.B., Office of Gen. Counsel; John Truesdale, Office of Executive Secretary; William A. Pascarell, Office of Director, Region 22, of counsel), for respondent-cross-petitioner.
 Before OAKES, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 Local 812, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO ("Local 812"), seeks review of an order issued against it by the National Labor Relations Board (the "Board"), reported at 302 NLRB No. 38 (1991).[1] The order[2] requires, inter alia, that Local 812 cease and desist from the following unfair labor practices. It must discontinue: (1) picketing or engaging in, inducing, or encouraging a strike or work stoppage by Canada Dry Bottling of New York employees; or (2) threatening, coercing, or restraining Canada Dry Bottling of New York, or the members of the Canada Dry Distributors Association of New Jersey, where in either case an object is to force or require the members of the Canada Dry Distributors Association of New Jersey or any other employer or self-employed person to join or remain a member of Local 812 or of the Canada Dry Distributors Association, Inc. for the purposes of collective bargaining. Local 812 must reimburse all membership dues and fees collected from the self-employed members of the Canada Dry Distributors Association of New Jersey subsequent to its unlawful picketing which began on February 9, 1989. Local 812 must send written notification to the members of the Canada Dry Distributors Association of New Jersey indicating that the collective bargaining agreements entered into for the period of June 1, 1987 through May 31, 1991 are null and void and post and furnish copies of various remedial notices.
 
 
 2
 In this enforcement proceeding, Local 812 challenges the Board's interpretation of section 8(b)(4)(A) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(b)(4)(A) (1988), and factual findings, both of which formed the basis for the Decision and Order.
 
 I.
 
 3
 This lawsuit arises out of charges filed on February 16, 1989 by Local 125, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO ("Local 125") alleging, inter alia, that Local 812 violated section 8(b)(4)(A) of the National Labor Relations Act (the "Act") by picketing three New Jersey distribution centers of Canada Dry beverages in order to force Canada Dry's 43 New Jersey distributors to remain members of Local 812 and to bargain collectively through the Canada Dry Distributors Association, Inc. The Board filed a complaint in March 1989 based on the charges.
 
 A. Background
 
 4
 Canada Dry Bottling of New York ("Canada Dry") operates a soft drink manufacturing and bottling plant in College Point, New York. Unionized drivers deliver its products to distribution centers in New York and in Carteret, Hackensack, and Whippany, New Jersey. Canada Dry retails its beverages through self-employed distributors--43 in New Jersey and between 100 and 125 in New York--who purchase distributorships from Canada Dry granting them the exclusive right to sell Canada Dry products within a defined territory or route. Each distributor buys cases of Canada Dry beverages at the distribution centers and then sells the cases to their customers, retaining a 15% commission.
 
 
 5
 Teamster's Local 812 represents employees who manufacture and distribute soft drinks and beer primarily in New York but also in New Jersey. Local 812 maintains a collective bargaining agreement with Canada Dry that covers the drivers and helpers employed by Canada Dry to deliver beverages from the bottling plant in College Point to the distribution centers in New Jersey. In addition, Local 812 seeks to obtain collective bargaining agreements from distributors covering any employees they might hire and the owners themselves if they perform labor. The administrative law judge found that Local 812 has been "somewhat lax over the years" in securing written agreements from the distributors. To be sure, Local 812 had no great need for reaching such agreements with the New Jersey distributors given that none of the 43 self-employed New Jersey distributors hired any additional employees.
 
 
 6
 Canada Dry assists Local 812 in assuring that their distributors at least secure and retain membership in Local 812. Canada Dry's standard distributor's agreement requires that each distributor sign a document attesting that a collective bargaining agreement has been entered into with Local 812 and authorizing Canada Dry to deduct union dues and pension, health, and welfare fees from the distributor's commissions. As a result, all of the New Jersey distributors were members of Local 812 for substantial periods of time prior to the events of this lawsuit.
 
 
 7
 Local 125 of the Teamsters also represents manufacturing and distribution employees in the soft drink industry, but primarily individuals employed in New Jersey.
 
 
 8
 Canada Dry's distributors in the New York and New Jersey area, in their capacity as distributorship owners, are also members of two trade associations. The Canada Dry Distributors Association, Inc. (the "Incorporated Association") was formed in September 1987 to facilitate purchasing group auto insurance and to serve as a group forum for discussing business problems of mutual interest. In addition, the New Jersey distributors belong to the unincorporated Canada Dry Distributors of New Jersey (the "New Jersey Association"). That group exists to provide a forum for the New Jersey distributors to discuss issues pertaining to the trade and business operations. Neither association constitutes a multi-employer bargaining unit such that members would be bound by any collective bargaining agreements reached by the associations with Canada Dry.
 
 
 9
 All of the 43 New Jersey distributors belong to the New Jersey Association and the vast majority belong to the Incorporated Association as well.
 
 B. Local 812's Picketing
 
 10
 In July 1988, the members of the New Jersey Association asked their counsel to transfer their union membership from Local 812 to Local 125. A meeting was held later that summer with Local 125 President Charles Giordano at which five or six New Jersey distributors were present to discuss their desire to become members of Local 125.
 
 
 11
 Following that meeting, in the fall of 1988, Giordano met with Local 812 President Anthony Rumore to inform him that the New Jersey distributors wanted to transfer to Local 125 and were circulating a petition for transfer to submit to the International. Giordano indicated to Rumore, however, that Local 125 would not accept their membership if Local 812 had collective bargaining agreements with the New Jersey distributors. Rumore responded that the transfer could take place so long as no collective bargaining agreements existed and a petition for transfer was filed.
 
 
 12
 In December 1988, all 43 New Jersey distributors signed petitions requesting transfer from Local 812 to Local 125. Giordano presented the petitions to Local 812 officers in Scarsdale, New York shortly thereafter. Giordano then asked for copies of any collective bargaining agreements between Local 812 and the New Jersey distributors. The union officers responded that they could not find any but would mail them to Giordano. None were ever mailed.
 
 
 13
 Further evidence that no collective bargaining agreements existed between Local 812 and the New Jersey distributors emerged in December. Local 812 demanded that all members of the Incorporated Association agree to arbitrate an increase in pension contributions. Following this request, counsel for the Incorporated Association requested copies from Local 812 of any collective bargaining agreements with members that would authorize such payments. No agreements were produced even after a civil suit to compel production was filed.
 
 
 14
 On January 4, 1989, directors of the New Jersey Association again met with Local 125 officers to discuss the transfer of membership and Local 125's health and pension programs at the local's office in Totowa, New Jersey.
 
 
 15
 That same month, Local 812 drafted a collective bargaining agreement purporting to have been in effect since May 1987 and forwarded the agreement to some of Canada Dry's New York distributors for their signature. Local 812 business agent Louie Didio testified at the hearing before the administrative law judge that in May 1987 he met with four distributors representing the Incorporated Association in College Point--despite the fact that the Association had not yet formally been incorporated--for purposes of negotiating a collective bargaining agreement. He claimed that one New Jersey distributor was present and authorized to negotiate on behalf of the remaining New Jersey distributors. He further testified that the representatives present at the meeting agreed to abide by whatever collective bargaining agreement was reached between the Pepsi-Cola Distributors Association and Local 812, which was being negotiated at the time. The Pepsi agreement was finalized in the first few days of June 1987.
 
 
 16
 Didio testified that no written collective bargaining agreements existed because Local 812 struck PepCom immediately following the Pepsi negotiations, thereby tying up Local 812's resources. All that the union had prepared up to the time of the strike were written stipulations regarding commission rates, pension contributions, and pay rates for helpers. None of the New Jersey distributors signed these stipulations.
 
 
 17
 On January 30, Didio met with some New Jersey distributors in a Hackensack diner and told them to sign the Local 812 collective bargaining agreement or the distribution centers in New Jersey would be picketed and union drivers would not deliver goods from College Point to the centers. The New Jersey distributors told Didio that they already had reached a collective bargaining agreement with Local 125.
 
 
 18
 A few days later, on February 3, Local 812 President Rumore sent a letter to all Canada Dry distributors calling for a meeting on February 7 with the Incorporated Association's board of directors to resolve these membership problems. The letter advised that Canada Dry President Dennis Berberich would be present and that "picket lines will be established" if the "problems" between Local 812 and the distributors were not resolved.
 
 
 19
 Just prior to that meeting, on February 6, a collective bargaining agreement was formally executed between Local 125 and the New Jersey distributors effective February 6, 1989 through February 6, 1992.
 
 
 20
 On February 8, the meeting called for in Rumore's letter was held. The meeting was attended by eight New York distributors, their counsel, Berberich and other officials of Canada Dry, Canada Dry's counsel, Local 812 President Rumore, Didio, other union officials, and the union's counsel. No New Jersey distributors attended the meeting. Counsel for the Incorporated Association advised that the distributors in the New Jersey Association, which he also represented, had already signed a collective bargaining agreement with Local 125. Rumore and Berberich each expressed their extreme displeasure with the New Jersey distributors. Berberich went so far as to warn the New York distributors present at the meeting that their trucks would not be loaded unless they signed an agreement.
 
 
 21
 In the early morning hours of February 9, the back-dated collective bargaining agreement prepared by Local 812 in January was signed by the Incorporated Association's directors.
 
 
 22
 At 2:00 a.m., after the agreement was signed, Local 812's executive board met and elected to picket the three distribution centers in New Jersey. Later that day, picket lines were established in Hackensack, Whippany, and Carteret. Additionally, unionized drivers stopped delivering goods from the Canada Dry plant in College Point to the New Jersey centers.
 
 
 23
 On March 4, 1989, the picketing ceased when eight New Jersey distributors capitulated and signed a collective bargaining agreement with Local 812 identical to the agreement signed by the Incorporated Association. Although only eight members signed the agreement, the remaining New Jersey distributors are abiding by its terms.
 
 
 24
 A hand-written side agreement was also executed at that time indicating that if the International awarded jurisdiction to Local 125 on the earlier petition for transfer, the agreement would be void. In October 1989, the International awarded jurisdiction to Local 812.
 
 
 25
 Several days of hearings were conducted before an administrative law judge which concluded on March 6, 1990. The judge found that Local 812 violated section 8(b)(4)(A) by forcing the New Jersey distributors to bargain through the Incorporated Association even though they already had joined that organization for other purposes. In addition, the judge found that Local 812 violated section 8(b)(4)(A) by forcing the New Jersey distributors to remain members of their union.
 
 
 26
 The Board considered Local 812's appeal and affirmed the judge's decision in an order dated March 29, 1991. For the reasons set forth below, we hereby enforce its order against Local 812.
 
 II.
 A.
 
 27
 Section 8(b)(4)(A) prohibits a union from engaging in conduct such as picketing with the object of forcing or requiring a self-employed person to "join" a union.[3]
 
 
 28
 Reasoning that "the purpose of the relevant portion of section 8(b)(4)(A) is to assure that employers and self-employed persons are free to refrain from belonging to a labor organization," the Board held that the statutory phrase "to join" also prohibits union efforts to force self-employers to remain members.
 
 
 29
 Local 812 appeals the Board's conclusion on the ground that the statute on its face makes no mention of the words "to remain" and, as a result, Congress could not have intended to proscribe conduct with the object of forcing self-employers to remain in a union.[4]
 
 
 30
 When faced with a question of statutory interpretation, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnote omitted).
 
 
 31
 Congress did not specifically address the question whether section 8(b)(4)(A) prohibits conduct with an object of forcing employers or self-employed persons to remain members of a union when the relevant language was added to the Act. See generally National Labor Relations Board, Legislative History of the Labor Management Relations Act, 1947 (1948) (Legislative History ). The phrase at issue was inserted by the conference committee of the Taft-Hartley Act of 1947 and was not part of either the Senate or House version that went to conference. The language was added to the Senate version, which the conference committee utilized as the basic structure for the legislation, in lieu of incorporating a section in the House passed bill which prohibited striking for the purpose of intimidating workers. Neither the House nor the Senate addressed the scope of the words "to join" during floor debate on adoption of the conference report, see, e.g., 93 Cong.Rec. 6537 (June 4, 1947), reprinted in 1 Legislative History 878-99; 93 Cong.Rec. 6601 (June 5, 1947) reprinted in 2 Legislative History 1541, or in the statement from the House managers of the conference. H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 548-49 (1947), reprinted in 1 Legislative History 505, 547-49.
 
 
 32
 In the absence of explicit guidance from Congress, we turn to the reasonableness of the Board's interpretation. Local 812's construction would create a loophole in the statute that would undermine Congress' effort in section 8(b)(4)(A) to prohibit compulsory union membership. See, e.g., 93 Cong.Rec. 3559 (April 15, 1947), reprinted in 1 Legislative History 657-59 (remarks of Rep. Buck). A local union would be permitted to force membership on any employer or self-employer so long as the union did not initially compel them to join. But the point in time when pressure is applied by a union (i.e., before joining or after joining) is not the critical factor in deciding whether a section 8(b)(4)(A) violation occurred; rather, the crux of a violation is conduct with the object of forcing union membership on the unwilling whenever that occurs.
 
 
 33
 The administrative law judge correctly highlighted the "illogic" of distinguishing members and non-members for purposes of section 8(b)(4)(A)'s coverage. By permitting such a distinction, this court would in effect require people such as the New Jersey distributors to leave their union before being permitted to complain about the union conduct preventing them from leaving.
 
 
 34
 In addition, broad construction of the term "join" is consistent with previous interpretations of section 8(b)(4)(A) by this court and the Board. In Associated Musicians of Greater New York, Local 802, 176 NLRB 198, 204-05 (1969), enforced, 422 F.2d 850 (2d Cir.1970), we enforced a Board order holding that a union violates section 8(b)(4)(A) by coercive conduct to force reinstatement of union membership. See also, Painters Local 249, 136 NLRB 176, 193-94 (1962). Also, in analogous cases, the Board has held that the statutory prohibition against coercing an employer to "enter" a hot-cargo agreement also prohibits attempts to force an employer to maintain, enforce, and reaffirm such agreements. See, e.g., Painters Orange Belt District Council 48, 276 NLRB 1372, 1385-86 (1985).
 
 
 35
 Based on these considerations, the Board's interpretation that section 8(b)(4)(A) prohibits conduct with the object of forcing or requiring employers or self-employers to remain members of a union is not only permissible and entitled to deference, see Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2781-82, but wholly consistent with congressional intent. Therefore, we hold that a labor organization violates section 8(b)(4)(A) whenever it engages in conduct with an object of forcing or requiring an employer or self-employed person to remain a member of a union.
 
 B.
 
 36
 Local 812 next argues that even if section 8(b)(4)(A) prohibits picketing to force employers to remain union members, no such violation occurred. The union contends that the New Jersey distributors remained in Local 812 not because of union picketing but because they voluntarily petitioned the International for a transfer to Local 125 which was subsequently denied.
 
 
 37
 The Board's findings of fact should be upheld if supported by substantial evidence on the record as a whole. NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 691, 71 S.Ct. 943, 952-53, 95 L.Ed. 1284 (1951); NLRB v. Local 3, International Brotherhood of Electrical Workers, 730 F.2d 870, 876 (2d Cir.1984). Here, substantial evidence supports the Board's conclusion that Local 812 picketed to force the New Jersey distributors to remain members. Three days after the New Jersey distributors reached a collective bargaining agreement with Local 125 and the morning after those distributors boycotted the meeting called by Local 812 to sign their collective bargaining agreement, picket lines were established and deliveries to the distribution centers in New Jersey ceased.
 
 
 38
 Local 812's argument that the New Jersey distributors remained members because of the International's decision to deny the transfer petition in October 1989 is beside the point. The fact remains that Local 812 engaged in prohibited conduct in early 1989--picketing with the object of forcing the New Jersey distributors to remain in the union. Whether the New Jersey distributors remained in the union because of that conduct or because of the International's decision is irrelevant.
 
 C.
 
 39
 The Board also found that Local 812 violated section 8(b)(4)(A) because it forced the New Jersey distributors to bargain through the Incorporated Association. In the Board's view, the picket lines and the halted deliveries were designed to coerce the New Jersey distributors into accepting the collective bargaining agreement reached between Canada Dry and the Incorporated Association in February 1989.[5]
 
 
 40
 Local 812 contends that the Board's conclusion is unsupported by substantial evidence. The union argues that its object in picketing was lawful--to hold the distributors to the collective bargaining agreement purportedly negotiated on their behalf back in May 1987 and signed by the Incorporated Association in February 1989.
 
 
 41
 Substantial evidence supports the conclusion reached by the administrative law judge and affirmed by the Board that the New Jersey distributors were not bound by any collective bargaining agreement arising out of the May 1987 meeting between four Canada Dry distributors and Local 812 business agent Didio.
 
 
 42
 The test in this court for determining if a multi-employer bargaining organization has been created "is whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargaining." Trustees of UIU Health & Welfare Fund v. New York Flame Proofing Co., 828 F.2d 79, 83 (2d Cir.1987) (quoting NLRB v. Beckham, Inc., 564 F.2d 190, 192 (5th Cir.1977)) (emphasis added); see also NLRB v. Bagel Bakers Council of Greater New York, 434 F.2d 884, 886-87 (2d Cir.1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971). Based on the record developed in the hearing before the administrative law judge, the Board properly concluded that the distributors present at the May 1987 meeting were not representatives of a multi-employer bargaining association authorized to bargain on behalf of the New Jersey distributors.
 
 
 43
 No evidence was presented during the hearing that the distributor from New Jersey who was present at the May 1987 meeting possessed any actual authority or any evidence of "unequivocal intent" from other New Jersey Canada Dry distributors to negotiate on their behalf. The only testimony regarding his authority came from the Local 812 business agent who implied that the New Jersey distributor possessed authority because he was a director of the Incorporated Association which, in the business agent's view, was authorized to bargain for the New Jersey distributors. But the hearing record reveals that: (1) the Incorporated Association was not even formed until September 1987 when the certificate of incorporation was filed; and (2) even had the Incorporated Association existed in May, it was formed not for multi-employer bargaining purposes but for purchasing group auto insurance and to deal with business problems of mutual interest.
 
 
 44
 Furthermore, Local 812 could not provide copies of any collective bargaining agreements binding the New Jersey distributors following the 1987 meeting, despite repeated requests for them during the six months prior to the attempted transfer to Local 125.
 
 
 45
 Local 812 also argues that a 1987 collective bargaining agreement was reached because the later conduct of New Jersey distributors in paying union welfare and pension contributions and seeking modifications in the welfare fund contribution rate proves adoption. But these payments arose because distributors were required by Canada Dry to pay a quasi-premium to Local 812 as part of Canada Dry's effort to deal exclusively with one union. The payments were technically pursuant to the so-called collective bargaining agreement mentioned in the distributor agreements. However, given that the New Jersey distributors generally had no employees, the payments were more like a fee exacted in order to obtain a distributorship than evidence of a true collective bargaining agreement governing terms and conditions of employment.
 
 
 46
 Therefore, the Board's conclusion that a multi-employer bargaining association did not bind the New Jersey distributors to a contract in 1987 and that the 1989 picketing was therefore designed to force those distributors to bargain through the Incorporated Association is supported by substantial evidence in the record as a whole.
 
 III.
 
 47
 Accordingly, we conclude that in February and March 1989, Local 812 violated section 8(b)(4)(A) of the Act by picketing Canada Dry's three distribution centers in New Jersey and by halting deliveries by unionized drivers from Canada Dry's plant in College Point, New York to the centers. We, therefore, enforce the Board's orders against Local 812 and direct immediate compliance therewith.
 
 
 
 [1]
 The Board filed a cross-application for enforcement of its order
 
 
 [2]
 The Board's order affirmed the findings, rulings, and conclusions of the administrative law judge with one technical modification. The administrative law judge omitted the word "transport" from the cease and desist portion of his recommended Order and notice; the Board amended the Order and notice to include the word
 
 
 [3]
 Section 8(b)(4)(A) provides in pertinent part:
 "(b) It shall be an unfair labor practice for a labor organization or its agents--
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization...."
 
 
 [4]
 The union also invokes a traditional tool of statutory construction by arguing that in 8(b)(1)(A), a parallel provision in the Act, Congress demonstrated an awareness of the difference between "joining" and "remaining." In that section, Congress provided that the prohibition against union interference with employee rights to organize should not impair a union "with respect to the acquisition or retention of membership therein." 29 U.S.C. § 158(b)(1)(A) (1988) (emphasis added). As a matter of construction, the argument runs, Congress' omission of the words "to remain" in 8(b)(4)(A) represents a deliberate policy choice to permit the conduct at issue in this case. But the words "acquisition or retention" merely reflect Congress' effort to clarify that 8(b)(1)(A) should not infringe on internal union governance rules. This evidence provides little probative value in deciding what public policy Congress was trying to effectuate through 8(b)(4)(A)
 
 
 [5]
 In the case at hand, all of the New Jersey distributors were members of the Incorporated Association at the time of the picketing, but not for purposes of collective bargaining. However, the parties do not dispute the Board's legal conclusion that section 8(b)(4)(A) prohibits a union from forcing an employer to bargain through an employer organization even though the employer already technically "joined" the organization but for other purposes. This conclusion follows earlier decisions of the Board and the courts that section 8(b)(4)(A) establishes a broad prohibition against all forms of coerced multi-employer bargaining, despite the more narrow language of the statute which literally proscribes only "forcing or requiring any employer or self-employed person to join any ... employer organization." 29 U.S.C. § 158(b)(4)(A) (1988) (emphasis added). See Mobile Mechanical Contractors Ass'n v. Carlough, 664 F.2d 481, 484-86 (5th Cir.1981) (prohibiting union efforts to compel an employer to act as if it were a member of an existing employer organization), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982); Frito-Lay, Inc. v. Local 137, International Brotherhood of Teamsters, 623 F.2d 1354, 1357-1359 (9th Cir.) (prohibiting coercive union conduct with the object of forcing employers to engage in multi-employer bargaining whether or not the employers are formally joined in an "employer organization"), cert. denied, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980)