Robert BOGAN and Scott Bogan,
Plaintiffs–Appellants,

v.

Austin E. HODGKINS, Jr.,
Defendant–Appellee,

Northwestern Mutual Life Insurance
Company, Defendant.

Docket No. 97–9295

United States Court of Appeals,
Second Circuit.

Argued April 22, 1998.

Decided Feb. 2, 1999.

Michael S. Devorkin (Doar Devorkin & Rieck, New York, NY), for Plaintiffs–Appellants.

Timothy P. Coon (Bleakley Platt & Schmidt, White Plains, NY), for Defendant–Appellee.

Before: WALKER and CALABRESI, Circuit Judges, and RESTANI,* Judge.

RESTANI, Judge:

This is an appeal from a partial final judgment and order of the District Court for the Southern District of New York, Conner, *J.*, granting the motion of Robert and Scott Bogan ("the Bogans" or "plaintiffs") to reconsider its prior opinion, *Bogan v. Northwestern Mut. Life Ins. Co.*, 953 F.Supp. 532 (S.D.N.Y.1997). The District Court vacated its judgment entered February 6, 1997, and (i) adhered to its prior decision granting partial summary judgment dismissing the Bogans' antitrust claims under Section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1 (1994) [hereinafter the "Sherman Act"], against Austin E. Hodgkins, Jr.; (ii) vacated that part of its prior opinion, and reserved decision on the exercise of supplemental jurisdiction over various state law claims against

* Honorable Jane Restani, of the United States Court of International Trade, sitting by designation.

Hodgkins and Northwestern Mutual Life Insurance Company ("NML") pending a decision on this appeal of the dismissal of the antitrust claims; (iii) denied in all other respects the Bogans' motion to vacate and amend the prior judgment; and (iv) directed entry of a partial final judgment, pursuant to Fed.R.Civ.P. 54(b).

Plaintiff-appellants contend that the District Court erred in granting partial summary judgment dismissing their antitrust claims against Hodgkins.[1] Defendant-appellees defend the District Court's grant of summary judgment but argue that the District Court erred in finding that defendants had the capacity to conspire and that the dispute was not exempt from antitrust enforcement under the McCarran–Ferguson Act, 15 U.S.C. § 1013 (1994).

## Jurisdiction

This court has jurisdiction under 28 U.S.C. § 1291 (1994).

## Standard of Review

This court reviews a grant of summary judgment *de novo*. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We determine whether there are disputed facts after resolving "all ambiguities and draw[ing] all factual inferences in favor of" the non-movant. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991).

## Background

### The Insurance Company

Northwestern Mutual Life Insurance Company operates in the New York metropolitan area through a multi-tiered structure of independent contractor insurance agents with exclusive contracts; agents have the exclusive NML policy franchise and may sell policies

for other carriers only after granting NML a right of first refusal. NML contracts with six General Agents, who in turn contract with Special Agents and with District Agents, who contract with Soliciting Agents.[2] General Agents for NML usually have exclusive territories, but six General Agents share the New York area.

Agents are compensated by commission on policy writings and renewals according to their structural position in the NML hierarchy. Thus, General and District Agents receive an override commission on the commissions paid to Sales Agents contracted to them. The rates of compensation are incorporated into the agents' contracts and reflect a uniform commission and fee schedule used by all NML agents in each tier. Actual policy terms and premiums are established by NML. General Agents pay for recruiting and training their own District and Sales Agents.

### The Metropolitan Agreement and NML Transfer Restriction Policy

What plaintiffs refer to as the "Metropolitan Agreement" ("the Agreement") is an agreement among NML General Agents not to recruit and hire each others' existing District or Sales Agents without the consent of the agent's current General Agent. According to Hodgkins, agent transfer restrictions initially were determined by "whatever the general agents agreed upon." A senior NML vice president characterized the Agreement as "among the general agents." At some point, the Agreement was reduced to a writing entitled the "Agreement for Open Territory for Both Solicitation and Development of the New York Metropolitan Area," providing that "[t]ransfer of agents between the General Agents will not be permitted."

NML literature referred to "friendly agreements" between NML General Agents which "restrict Agents from transferring from one agency to another within [a] metropolitan area," adding that exceptions are

---

1. This appeal concerns only plaintiffs' antitrust claims, and they made none against NML. Thus Hodgkins is the sole respondent on appeal.

2. For simplicity, we will refer to both Special and Soliciting Agents as Sales Agents.

made "by the mutual agreement of the General Agents involved." NML's legal staff, aware of the possibility that "a no-transfer policy can be considered to be a boycott or a refusal to deal," expressed concern about the antitrust implications of such agreements— that is, about "whether the 'no transfer' rule is effectively a restraint of trade." NML has made various references to the Agreement as an agreement of or among the General Agents.

In November 1989, NML met with the General Agents to discuss the transfer restriction policy, issuing a memo regarding the meeting entitled "New York Metropolitan Agreement." By December 1989, NML was referring to the Agreement as "Company Policy." NML viewed its own potential participation in the Agreement as arbitrating disputes over transfers.

**The Bogans**

Robert Bogan began his relationship with NML as a Sales Agent in 1976. In 1987, he became a District Agent, under Hodgkins' General Agency. Robert Bogan claims to have been a very successful District Agent, ranked fourth out of 300 nationwide. He also purports to have invested $1.5 million in the development and improvement of his District Agency. He asserts that during his tenure as District Agent, the District Agency increased from three to fifteen agents, while annual sales increased from $11 to $120 million.

Scott Bogan, Robert's brother, became a Sales Agent in 1985 under Robert's predecessor District Agent. After working briefly under Hodgkins, in 1987 he signed a Sales Agent's contract with Robert Bogan.

**The Bogans' Termination**

■ Robert Bogan and Hodgkins were involved in a long-running dispute concerning two Sales Agents whom Bogan accused of writing policies with other carriers in violation of the exclusive dealing clause in their NML contract.[3] Bogan claims Hodgkins told

him not to interfere, as part of a plot to take over his District Agency and to give it to the two Sales Agents, who were Hodgkins' friends.

As the culmination of this dispute, on May 29, 1990, Robert Bogan was terminated by Hodgkins with thirty days notice, effective June 30, 1990. Upon Robert Bogan's termination, all Sales Agent contracts under him, including Scott Bogan's, were automatically terminated. In accordance with Bogan's District Agent contract, Hodgkins requested the records of the two Sales Agents. When Robert Bogan stalled and refused to comply with this request, on June 4, 1990, Hodgkins terminated him for cause, allegedly as a pretext to trigger the agent transfer restrictions.

During the dispute, Hodgkins had cited the transfer restriction, warning Bogan in writing shortly before his termination that "recontracting/transferring to another Metro/NYC office is *NOT* an option," and verbally that he could "either work for [Hodgkins] or get out of the business." Following his termination, Robert Bogan signed a Sales Agent contract with Gerald Gilbert, another of the six NML New York General Agents. On June 11, 1990, Scott Bogan allegedly tried to contract as a Sales Agent under Robert Bogan acting as a District Agent under Gilbert as General Agent. NML refused to approve Robert Bogan's contract with Gilbert.

Robert and Scott Bogan then contracted as agents for Massachusetts Mutual Life Insurance Company, also in the New York area, retaining the offices they occupied as NML agents.

**Issues on Appeal**

■ On appeal, the Bogans raise several arguments to support their contention that the District Court erred in granting summary judgment to Hodgkins on their antitrust claim pursuant to the so-called "rule of

---

3. The facts relating to the Bogans' termination are highly contested but relate only to their state law claims, not the antitrust claim at issue on appeal. Plaintiffs need not show enforcement of the alleged agreement in restraint of trade to prove their antitrust claim. *See American Tobac-*

*co Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). We therefore present these facts in abbreviated form simply to clarify the context of the litigation and as an example of the functioning of the Agreement.

reason."[4] First, they argue that the Agreement is *per se* illegal both as a horizontal agreement in restraint of trade and as a group boycott. Second, they ask that if we disagree with them that the Agreement fits into one of these established categories of *per se* illegal conduct, we establish a new category of *per se* illegal action to apply here. Third, they urge us to view the Agreement as a "naked restriction" so that it would invoke the abbreviated version of the rule of reason known as "quick look." Finally, the Bogans challenge the District Court's determination that the Agreement enhances interfirm competition, arguing (1) that the relevant market for analysis is the intrafirm (i.e., within NML) submarket for experienced NML agents services; and (2) that the Agreement deleteriously affects that submarket by preventing NML General Agents from competing for the services of experienced NML agents. Because we find that the Bogans do not succeed on any of their theories, we need not reach Hodgkins' contentions on appeal that the District Court erred in not deciding in favor of Hodgkins on other grounds as well.

## DISCUSSION

█ The parties disagree as to the origin and character of the transfer restriction policy. The Bogans' antitrust case depends on their allegation that the Agreement was primarily and initially a horizontal agreement between the General Agents rather than an NML policy.[5] The company's publication of the Agreement and later recharacterization of it as a company policy, however, indicate the existence of vertical elements. Whether the Agreement is purely horizontal, a mixture of horizontal and vertical, or purely vertical determines at least in part whether the Agreement is *per se* illegal or analyzed under the rule of reason.

█ In deciding what kind of antitrust analysis it should apply, the District Court stated that "[i]n resolving these issues [it had to] first determine the proper characterization of the Metropolitan Policy under the Sherman Act." In making this determination, the District Court resolved issues of fact at summary judgment as to the nature of the alleged agreement in restraint of trade. This was error. But because the Bogans could not prevail at trial under *any* characterization of the Agreement, we affirm the District Court's grant of summary judgment. For the present analysis, we accept *arguendo* the facts as alleged by the Bogans as non-movants at summary judgment. Thus, we assume plaintiffs' view of the Agreement as primarily horizontal, rather than vertical.

█ The language of the Sherman Act is broad, prohibiting every contract, combination, or conspiracy in restraint of trade. *See* 15 U.S.C. § 1. Applying the rule of reason, the Supreme Court has read the Act to forbid only "unreasonable" restraints, as a literal reading would absurdly bar all contracts. *See Standard Oil Co. v. United States,* 221 U.S. 1, 60, 87, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In particular, not all cooperative conduct has a deleterious effect on competition; indeed, some cooperative arrangements foster rather than harm competition. *See, e.g., Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1, 20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (noting that cooperative practices are acceptable if "designed to 'increase economic efficiency and render markets more, rather than less, competitive'" (quoting *United States v. United States Gypsum Co.,* 438 U.S. 422, 441

---

4. The rule of reason directs the trier of fact to "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

5. The Bogans are not estopped from alleging in this case that the Agreement was not NML policy, despite having characterized the restraint as such in state court. Generally, a party may not take a position inconsistent with that taken in a prior legal proceeding, where that party prevailed in the first case. *See Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). Where, as here, the party did not succeed, that party is not estopped from later inconsistent assertions. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,* 903 F.2d 109, 114 (2d Cir.1990). Thus, a party is not bound by a position not successfully maintained. *See In re Cassidy,* 892 F.2d 637, 641 (7th Cir.1990).

n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978))); *Board of Trade v. United States*, 246 U.S. 231, 240–41, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (noting that futures trading created a public market for grain arrivals).

■ Certain practices, however, are so obviously anticompetitive that courts consider these to be *per se* violations of the Sherman Act. The Supreme Court has recognized

> certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness . . . avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

■ Examples of *per se* illegal conduct include group boycotts, division of markets, and tying arrangements. *See id.* These categories reflect judicial experience with the rule of reason. *See Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable.").

■ Only "manifestly anticompetitive" conduct, however, is appropriately designat-ed *per se* illegal. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The majority of allegedly anticompetitive conduct continues to be examined under the rule of reason. *See Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir.1993). Where cooperation is inherent in an enterprise, *per se* treatment is not always the appropriate measure of antitrust illegality. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 295, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Absent a showing that a presumption of anticompetitive effect is appropriate, we apply the rule of reason.[6] *See id.* at 297, 105 S.Ct. 2613.

Courts have been reluctant to expand the categories of *per se* illegality. *See Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983) ("A particular course of conduct will not be termed a *per se* violation . . . until the courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects."). The Supreme Court has warned against "indiscriminately" expanding "the category of restraints classed as group boycotts," noting that "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The Supreme Court is "slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 458–59, 106 S.Ct. 2009.

---

**6.** Plaintiffs conceded at oral argument that they cannot succeed under the rule of reason, so the issue on appeal is only whether the Agreement is *per se* illegal. To avoid examining the relevant market, market power, and anticompetitive effect in all cases in which conduct does not clearly fit within a *per se* category, the Supreme Court has sanctioned an intermediate inquiry, known as "quick look," if the conduct at issue is a "naked restriction." *See NCAA v. Board of Regents*, 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Under quick look, once the defendant

has shown a procompetitive justification for the conduct, *see id.* at 113, 104 S.Ct. 2948, "the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis," *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir.1993).

Here, Hodgkins has countered the Bogans' characterization of the Agreement as a "naked restriction" with sound allegations of procompetitive benefit. Thus, at best the inquiry returns to the rule of reason, under which the plaintiffs concede they lose.

Thus, to trigger *per se* treatment the Bogans must present a "threshold case that the challenged activity falls into a category [of conduct] likely to have predominantly anticompetitive effects." *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. 2613. We find that the Bogans' allegations do not trigger *per se* treatment because the Agreement does not fit into any of the established *per se* categories.

The Agreement is clearly not a territorial or customer allocation because the record reveals no geographic or market division. The Bogans suggest that the Agreement may be a supplier allocation, but the facts do not bear this interpretation; the Agreement permits transfers, and experienced NML agents do not comprise the entire set of suppliers of their services. Thus, while the Agreement may constrain General Agents to some degree, it does not allocate the market for agents to any meaningful extent.

The Bogans' strongest argument is that the Agreement may be a group boycott in restraint of the market for insurance sales agents. Generally, group boycotts are illegal *per se*. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Not all such boycotts, however, are *per se* violations. *See Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. 2613. The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust law. *See Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n,* 641 F.Supp. 1179, 1186 (S.D.N.Y.1986) (citing L. Sullivan, Handbook of the Law of Antitrust 229–30 (1977)). This Agreement, moreover, does not fit the classic model of a group boycott—that is, a "concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978).

The categories of *per se* illegal practices are an approximation, a shortcut to reach conduct that courts can safely assume would surely have an anticompetitive effect. Thus, it is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur. *See, e.g., Belfiore v. New York Times Co.,* 826 F.2d 177, 180–81 (2d Cir.1987) (affirming summary judgment for the defendant because the plaintiff failed to prove the relevant market); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980) (noting that the plaintiff has the burden to prove the relevant market).

The Bogans allege that the General Agents conspired to restrain trade in the market for experienced NML sales agents. The Agreement is, therefore, not a classic interfirm horizontal restraint of trade in insurance sales agents. Rather it is akin to an *intra* firm agreement, one between General Agents of the same company to restrain trade only in experienced sales agents of that company. No-switching restriction cases typically involve multiple companies. *See, e.g., Quinonez v. National Ass'n of Securities Dealers,* 540 F.2d 824, 826 (5th Cir.1976); *Nichols v. Spencer Int'l Press, Inc.,* 371 F.2d 332, 333 (7th Cir.1967). The agreement here is far from a typical *per se* illegal restraint, consistent with the fact that antitrust law shows more concern to protect interrather than intrabrand competition. *See NYNEX Corp. v. Discon, Inc.,* — U.S. ——, 119 S.Ct. 493, 497–500, 142 L.Ed.2d 510 (1998); *Northwest Power Prods., Inc. v. Omark Indus., Inc.,* 576 F.2d 83, 87 (5th Cir.1978).

Even if the Agreement were interfirm, we still would not afford it *per se* illegal treatment. We have previously identified interagency no-switching agreements as "distinguishable from those boycotts that have been held illegal *per se.*" *Union Circulation Co. v. Federal Trade Comm'n,* 241 F.2d 652, 657 (2d Cir.1957). Although such agreements fall within the ambit of antitrust law, we have nonetheless denied them *per se* treatment because "a harmful effect upon competition [was] not clearly apparent." *Id.* Because the Agreement's anticompetitive effect on the market for insurance sales agents is not obvious, we do not find the Bogans to have made a case sufficient to cross the threshold to *per se* treatment.

The Bogan's antitrust case might have been redeemed by their allegation that the Agreement restrains not the entire mar-

ket but rather a submarket cognizable to antitrust analysis, if they had supported that allegation factually. *See NCAA*, 468 U.S. at 104 n. 26, 104 S.Ct. 2948 ("*Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct."). Defining a submarket is a fact-driven inquiry into

> such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also North Am. Soccer League v. NFL*, 670 F.2d 1249, 1260 (2d Cir.1982) (holding that the record of the case disclosed a distinct submarket for sports capital and skill).

The Supreme Court has explained that the parameters of a market are defined by the cross-elasticity of demand between the product and its substitutes. *See Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. While a submarket may function as the relevant market for antitrust purposes, more is required than a showing that a product differs from others. Submarkets do exist, notwithstanding the empirical difficulty of demonstrating them, but plaintiffs have not even made an effort to do so.

The Bogans argue that the specialized training and expertise of experienced NML agents creates a submarket distinct from the market for all NML sales agents (both new and experienced) and from the general market for insurance sales agents in New York. But they have introduced no factual evidence regarding the demographics of the New York insurance market. In the end, the problem with the Bogans' proposed submarket is that other insurance companies compete for the services of experienced NML agents, as is clearly evidenced by the Bogans having found other work after being terminated from NML.[7]

---

7. Furthermore, the Bogans' submarket definition is inconsistent with their claim to antitrust injury. Given that NML is only one of many carriers in the New York area, any alleged conspiracy by

Plaintiffs have failed to show the allegedly relevant market to be a cognizable submarket. To the contrary, on these facts, the market for experienced NML agents is no more distinct than a market for the former employees of any single company. *See Disenos Artisticos E Industriales, S.A. v. Work*, 714 F.Supp. 46, 48–49 (E.D.N.Y.1989) (granting summary judgment for defendant where plaintiff failed to show relevant submarket was single brand of figurines, not decorative giftwear market). Moreover, having stated only their own desire to retain their status as NML agents, plaintiffs have stated no facts upon which a reasonable jury could conclude that the asserted submarket would exist but for the transfer restrictions.

**Conclusion**

We affirm the District Court's grant of partial summary judgment for defendants on plaintiffs' Sherman Act § 1 antitrust claim. Plaintiffs fail to establish a threshold case for *per se* treatment for failure to specify the relevant market in which the horizontal agreement they allege could have an obvious anticompetitive effect.

Accordingly, the judgment of the District Court is affirmed.

---

General Agents to restrict intra-NML transfers would only *encourage* other insurers' entry into a hypothetically distinct market for experienced NML agents, increasing competition.