136

Joseph WEISFELD, on his own behalf and as representative of a class of similarly situated current and former employees of defendants, Plaintiffs,

v.

SUN CHEMICAL CORP., Kohl & Madden Printing Ink Corp., a division of Sun Chemical Corp., Flint Ink Corp., Inx Internat'l Ink Co., Monarch Color Corp., Michleman, Inc., International Paper Co., Georgia–Pacific Corp., as successor to James River Corp., Pierce & Stevens Corp., Tacc International Corp., as successor to Miracle Adhesives Corp., and ABC Corp. I–X, being fictitious defendants whose identities are not presently known, Defendants.

No. 01–CV–2100 (JAP).

United States District Court,
D. New Jersey.

Oct. 17, 2002.

Thomas Smith Howard, Kirsch, Gartenberg & Howard, Hackensack, NJ, for Plaintiff.

Michael K. Furey, Riker, Danzig, Scherer, Hyland, & Perretti, Morristown, NJ, for Defendants Sun Chemical Corp. and its Subsidiary Kohl & Madden Printing Ink Corp.

Thomas L. Weisenbeck, Bressler, Amery & Ross, Morristown, NJ, for Defendant Flint Ink Corp.

William W. Robertson, Robertson, Freilich, Bruno & Cohen, LLC, Newark, NJ, for Defendant INX International Ink Co.

OPINION

PISANO, District Judge.

## I. INTRODUCTION

This is a civil antitrust action based upon allegations of horizontal price fixing and an illegal boycott in the market for employees in the printing ink manufacturing industry. The Plaintiff, Joseph Weisfeld, filed this action on behalf of himself as well as a class of similarly situated persons. This Court has jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Presently before this Court is Plaintiff's motion for class certification pursuant to Fed. R.Civ.P. 23(b)(3). Defendants filed opposition. The Court decides this motion without oral argument pursuant to Rule 78. In ruling on a motion for class certification, the Court does not consider the merits of the case, and takes as true the substantive allegations within the Plaintiff's amended complaint. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Accordingly, the facts recited herein are not the Court's findings of fact.

For the reasons set forth below this Court denies Plaintiff's motion for class certification because he has failed to satisfy the prerequisites for class certification under Fed. R.Civ.P. 23(b).

## II. BACKGROUND

Class representative Joseph Weisfeld ("Weisfeld") was, until May 31, 2000, an employee of Defendant Sun Chemical Corp. ("Sun"). Prior to his retirement, he held the position of Director of Technical and Regulatory Affairs for Defendant Kohl & Madden Printing Ink Corp. ("Kohl"), a division of Sun.[1] Compl. ¶ 1, Pl. Br. at 3. In the First Amended Complaint, Weisfeld brings this action on behalf of himself as well as a purported class of:

> [A]ll persons who were employed by defendants, or any predecessor, affiliate or subsidiary of any defendant, at any time during the period beginning at least as early as May 1, 1997 and continuing through May 1, 2001 inclusive (the "Class Period"), and who suffered damages as a result of

---

1. Shortly before his retirement, Weisfeld filed an ERISA lawsuit (the "Employment Action") against Sun, which is currently pending in this District.

defendants' illegal conspiracy and violation of the antitrust laws.

Pl. First Am. Compl. ¶ 17, at 4–5.

Plaintiff apparently recognizes that this class definition is overly broad and vague. In a footnote in his brief in support of class certification, Plaintiff seeks to narrow the definition of the class to "reflect the limited definition of the Class [as] set forth in paragraphs 20–28 of the First Amended Complaint." Pl. Br. at 1, n. 1. However, those cited paragraphs do not offer a class definition, but rather delineate the relevant market Plaintiff proposes to use for his antitrust theory of liability.

Despite the failure of Plaintiff to amend his complaint to reflect the proposed change in the class, this Court will use the modified class definition for purposes of this class certification motion pursuant to Fed.R.Civ.P. 23(c)(4). *See, e.g., Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir.1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."). Therefore, using the market definition Plaintiff cites as guidance, the new proposed class may be defined as:

> [P]ersonnel who provide technical services and who possess specialized knowledge and skills in the manufacture, distribution and sale of printing inks who were employed by defendants, or any predecessor, affiliate or subsidiary of any defendant, at any time during the period beginning at least as early as May 1, 1997 and continuing through May 1, 2001 inclusive (the "Class Period"), and who suffered damages as a result of defendants' illegal conspiracy and violation of the antitrust laws.

Plaintiff alleges that Defendants Sun, Kohl, Flint Ink Corp. ("Flint Ink") and INX International Ink Co. ("INX")[2] entered into a conspiracy, in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and New Jersey's antitrust statute, N.J.S.A. 56:9–3, *et seq.,* to restrain the labor market for technical employees in the printing ink industry.

Plaintiff alleges that Defendants control a dominant market share in the manufacture of printing inks. Pl. Br. at 2. Plaintiff claims that an alleged conspiracy was effectuated by a series of "no hire" agreements[3] and/or policies, by which certain Defendants agreed not to solicit or hire the employees of their competitor printing ink manufacturers, in violation of federal and state antitrust laws. Compl. ¶ 25.

Plaintiff alleges anti-competitive agreements between Sun and Flint, beginning with a 1994 agreement that was reached in the settlement of litigation challenging Flint's solicitation and hire of a Sun employee, Michael Panko. As part of that settlement agreement, Sun and Flint agreed that for a period of five years neither company would solicit the other's employees, and agreed to notify the other if they were planning to hire an unsolicited employee. Pl. Reply Br. at 3. Plaintiff claims that in addition to the settlement agreement, Sun and Flint (and Sun and INX) later entered into more extensive agreements, in which Defendants promised not to hire each other's employees at all.

Plaintiff points to an April 23, 1997 memorandum by Sun's General Counsel as evidence of an unwritten "no hire" agreement between Sun and Flint that substantially enlarged the terms of the 1994 *Panko* settlement. This enlarged agreement apparently involved Sun and Flint agreeing for the "indefinite future" not to hire or consider hiring any of the other's employees. Pl. Reply Br. at 4. As further evidence of these restrictive agreements, Plaintiff submits various correspondence between Sun and its personnel managers, advising them of the "no hire" agreement(s).

Plaintiff alleges that despite INX's non-involvement in the *Panko* litigation, INX and Sun entered into a "no hire" agreement of their own, sometime between 1997 and 1998. Plaintiff offers internal Sun memoranda as evidence of this agreement, describing "a

---

**2.** Plaintiff has agreed to voluntarily dismiss his claims against all other Defendants named in the Complaint. Pl. Br. n. 1

**3.** Defined as express agreements whereby two or more employers reciprocally agree not to hire the other's employees. Compl. ¶ 46.

total ban on hiring of individuals by either company ... until further notice." Pl. Reply Br. at 5, Howard Decl. Exs. 4 & 6.

As a result of these agreements, Plaintiff argues that the United States market for personnel who have the "specialized knowledge and skills" in the manufacture, distribution, and sale of printing inks was adversely impacted, resulting in lower salaries for members of that labor market, as well as the loss of the opportunity for Plaintiff and class members to obtain more remunerative employment elsewhere. Plaintiff seeks redress for these effects in the form of declaratory relief, treble and punitive damages, and attorneys' fees.

## III. RULE 23(a) REQUIREMENTS

A putative class representative seeking class certification must satisfy the four requirements of Rule 23(a), and must also demonstrate that the action is maintainable under one of the three categories set forth in Rule 23(b). *Barnes v. American Tobacco Co.*, 161 F.3d 127, 140 (3d Cir.1998) (citation omitted), *cert. denied*, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999). "The burden of establishing that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met rests with the plaintiff." *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493, 499 (D.N.J.2000) (internal citation omitted). A court must undertake a "rigorous analysis" to determine whether the putative class and its proposed representatives satisfy each of the prerequisites to class certification. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Considering whether class certification is appropriate, a court must refrain from conducting a preliminary inquiry into the merits of the action. *Eisen*, 417 U.S. at 178, 94 S.Ct. 2140. However, the court may need in some cases "to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 339 (D.N.J.1997).

### 1. *Rule 23(a) Requirements*

#### a. Numerosity

■ The first requirement of Rule 23(a) is satisfied when "the class is so numerous that joinder of all members is impracticable...." Fed.R.Civ.P. 23(a)(1). To meet the impracticability standard, a party need not prove that joinder of every class member is impossible; instead, proof of "difficulty or inconvenience of joining all members of the class" suffices. *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 406 (D.N.J.1990) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964)). "No magic number exists satisfying the numerosity requirement." *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa.1989); *see, e.g., Manning v. Princeton Consumer Disc. Co.*, 390 F.Supp. 320, 324 (E.D.Pa.1975) (finding that fourteen class members were enough to satisfy the numerosity requirement), *aff'd*, 533 F.2d 102 (3d Cir.), *cert. denied*, 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144 (1976); *Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426, 428 (M.D.Pa.1971) (finding that three-hundred thirty class members was not so numerous to render their joinder impracticable).

Plaintiff alleges the purported class would include "several thousand" current and former employees of Defendants. Compl. ¶ 18(a). Defendants raise no objection to this requirement and the Court agrees that this number is plausible. Thus, the Court finds Plaintiff satisfies the numerosity requirement.

#### b. Commonality

■ The second requirement under Rule 23(a) is met when "there are questions of law or fact common to the class...." Fed. R.Civ.P. 23(a)(2). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (citations omitted).

Plaintiff identifies several issues that are common to all class members: whether Defendants engaged in a conspiracy, whether that conspiracy violated the Sherman Act, whether, and to what extent, the alleged

conspiracy affected class members' compensation, and finally, the length and pervasiveness of the alleged conspiracy.

Defendants do not challenge Plaintiff's showing of commonality under Rule 23(a). This Court finds that, in identifying these issues, Plaintiff has satisfied the commonality requirement of Rule 23(a).

### c. Typicality

■ The third requirement of Rule 23(a) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class...." Fed. R.Civ.P. 23(a)(3). The concept of typicality "is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57 (citations omitted). "The representative parties' claims are generally found to be typical if they arise from the same course of conduct that gives rise to the claims of the other class members and if the claims are based on the same legal theory." *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540, 544 (D.N.J.1999).

Weisfeld alleges that his claims are typical of the claims of the Class because "he provided technical services and skills related to the manufacture and use of printing inks and coatings as an employee of one of the defendants," Compl. ¶ 18(c), and all purported class members' claims arise out of the same conduct and are based on the same legal theories. Pl. Br. at 9.

Defendants challenge that Weisfeld's claims are not typical of the Class for a variety of reasons. In particular, in his deposition taken for the Employment Action, Weisfeld testified that he was very comfortable working at Kohl, felt he was fairly compensated, never sought employment elsewhere, and disregarded the solicitations of recruiters seeking to offer him alternative employment. *See* Defs. Opp. at 3–4 (Franzblau Cert. Ex. B). The Court acknowledges Defendants' concerns about Weisfeld's unique circumstances.

However, the threshold for satisfying the typicality prong is a low one. "[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1035 (N.D.Miss.1993).

Plaintiff and the class's claims both stem from the same alleged illegal conduct—the no hire agreements between sets of defendants. Having considered Defendants' arguments against typicality, this Court finds that Weisfeld's claims are sufficiently typical of the purported class members for purposes of this Opinion.

### d. Adequacy of Representation

■ The fourth requirement of Rule 23(a) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). A two-prong test determines whether the representation is adequate: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.) (citation omitted), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *see also In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130, 140 (D.N.J.1984).

Plaintiff points out that his counsel, Thomas S. Howard, Esq., is a certified civil trial attorney in the State of New Jersey and has practiced for over 25 years, including complex litigations in federal and state courts. This Court does not find any problems presented by Mr. Howard representing the proposed Class.

However, Defendants raise objections to the choice of Weisfeld as a class representative. Defendants point out that Weisfeld is currently suing his former employer, Kohl, for unpaid employment benefits and may have interests adverse to his fellow class members, or may need to litigate defenses that are only applicable to him, given his high position at Kohl and knowledge of some of the "no hire" agreements. These unique

defenses include waiver, judicial estoppel and the failure to mitigate damages. For support, Defendants again cite Weisfeld's deposition testimony, where Plaintiff conveys his job and salary satisfaction, discussed *supra.* Defendants also allege that Weisfeld has a "potential positional conflict" with other proposed class members because of his awareness of the no hire policy during his tenure as a supervisor at Kohl.

In considering the parties' arguments, this Court understands that "the standards for measuring the predominance of common issues under ... 23(b)(3) should not be imputed to adequacy of representation ... because the predominance requirement is more stringent than commonality and typicality." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 185–86 (3d Cir. 2001). The Court has considered all arguments and finds that the relatively low threshold for adequacy of representation under Rule 23(a)(4) has been met and will consider the parties' arguments on this subject further as part of its Rule 23(b)(3) analysis.

## IV. RULE 23(b)(3) REQUIREMENTS ARE NOT SATISFIED

After satisfying the criteria set out in Rule 23(a), a party seeking class certification must also meet the requirements of Rule 23(b)(1), (2), or (3). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Plaintiff seeks class certification under Rule 23(b)(3), which provides that a class action may be maintained if a court finds: (I) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (ii) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### A. Predominance

The predominance inquiry requires a court to analyze "whether [a] proposed class[ ] is sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231. The require-

ment that common questions of law or fact predominate over individual issues does not mean that the existence of individual issues defeats certification; instead, questions affecting only individual members of the class must have lesser overall significance than the issues common to the class, and they must be manageable in a single class action. *See Sanneman v. Chrysler Corp.,* 191 F.R.D. 441, 448 (E.D.Pa.2000) (citation omitted). When conducting the predominance inquiry, a court must examine not only factual issues, but also the applicable law. *See Chin v. Chrysler,* 182 F.R.D. 448, 453 (D.N.J.1998) "Common questions of law may be said to predominate when significant legal issues are common to each class member's cause of action or to the defense of such claims." *Id.* at 453.

In an antitrust class action, Plaintiff, on behalf of the class, must show that common or generalized proof will predominate with respect to each element of the antitrust claim: violation of the antitrust laws; antitrust injury; and the amount of damages sustained. *See, e.g., Danny Kresky Enter. Corp. v. Magid,* 716 F.2d 206, 209–210 (3d Cir.1983). This Court will address each of these elements in turn.

#### 1. *Violation of the Antitrust Laws*

■ To ascertain whether there has been a violation of the antitrust laws, a court will have to examine Defendants' conduct, and will not consider the conduct of individual class members. *See, e.g., Lumco Indus., Inc. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 172 (E.D.Pa.1997). Plaintiff alleges an unreasonable restraint of trade under Section One of the Sherman Act, which will ultimately require Weisfeld to prove: (1) a contract, combination, or conspiracy among two or more independent actors; (2) that unreasonably restrains trade; (3) and is within, or substantially affects, interstate or foreign commerce.

Contracts among employers to not hire the employees of other parties to the agreement have been recognized as implicating the Sherman Act. *See, e.g., Radovich v. Nat'l Football League,* 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Nichols v. Spencer Internat'l Press, Inc.,* 371 F.2d 332, 334

**142**

(7th Cir.1967). As Plaintiff seeks to prove a violation of the antitrust laws by alleging a price-fixing and/or boycott conspiracy among all Defendants to restrain trade in the market for skilled printing ink employees, without offering any opinion as to the merits of Plaintiff's claims, this Court finds that this element is satisfied as to all purported class members for purposes of this Opinion.[4]

### 2. Antitrust Injury

Antitrust injury, or impact, is the "fact of damage" that results from a violation of the antitrust laws. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977). In *Bogosian*, the Third Circuit emphasized that "proof of impact [may] be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Id.* But, "[w]hether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case." *Id.* The damage alleged must show that each individual suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

Plaintiff classifies his claims as traditional horizontal price fixing and group boycott, naked restraints on trade that some courts have analyzed as *per se* antitrust violations. The Supreme Court has defined a *per se* violation as an agreement "whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). But these plainly anti-competitive effects must impact competition as a whole. "Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints."

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). This rule is in contrast to the rule of reason, where a court will analyze the agreement's effect on competition in a relevant market, looking at the "totality of the circumstances surrounding an alleged anti-competitive activity, including facts peculiar to the relevant business, to determine the 'nature or purpose' of the allegedly illegal restraint." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 144–45 (3d Cir.2001) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)).

Plaintiff argues that when a defendant has been accused of price fixing, impact should be presumed as a matter of law.[5] Antitrust injury may be presumed when a plaintiff alleges a *per se* violation of the antitrust laws. However, despite Plaintiff's attempts to characterize Defendants' conduct as traditional price fixing, this is certainly not a traditional price fixing case, so this Court declines to presume injury as a matter of law.

In *Eichorn v. AT & T Corp.*, 248 F.3d 131 (3d Cir.2001), the Third Circuit, rejecting plaintiffs' call for an application of the *per se* rule, determined that no hire agreements executed subsequent to the sale of a company was properly reviewed under the rule of reason. In 1995, Defendant Lucent Technologies put Paradyne Corp., a manufacturer of telecommunication parts, up for sale. *Id.* at 136–37. To make Paradyne more attractive to its potential and ultimate purchasers, Lucent entered into a series of agreements that restricted the hire, rehire, retention, and solicitation of former Paradyne employees by Lucent, or any other AT & T division, for a period of several months. *Id.* A group of former Paradyne employees sued, alleging that the agreements constituted an illegal group boycott and/or horizontal price fixing

---

**4.** This Court has considered Defendants' argument that while Plaintiff alleges a conspiracy amongst all Defendants, at best, Plaintiff suggests the existence of separate agreements between particular Defendants, and not necessarily among all of them. Defs. Opp. at 6–7. This Court finds that whether there were separate

conspiracies or one overarching conspiracy is irrelevant for purposes of this prong.

**5.** This presumption has been described as the "*Bogosian* short cut." *In re Linerboard Antitrust Litig.*, 305 F.3d at 151–52 (3d Cir.2002).

arrangement, in violation of Section One of the Sherman Act.

The court in *Eichorn* found that these types of agreements were unsuitable for *per se* analysis. *Id.* at 144–45. The court found that such agreements implicated the antitrust laws as a preliminary matter, but determined that the agreements were correctly evaluated using a rule of reason analysis. "As several courts have recognized, the *per se* rules of illegality are the exception to antitrust analysis and are only employed in certain recognized categories." *Id.* at 144 (citing *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1506 (11th Cir.1989)). *See also Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir.1999) (applying rule of reason to no hire agreement). Furthermore, the Third Circuit emphasized that "[t]he antitrust laws were not designed to protect every uncompetitive activity, but rather only those activities that have anti-competitive effects on the market as a whole . . . [n]ot all arrangements among actual or potential competitors . . . are *per se* violations of the Sherman Act." *Id.* at 148 (internal citation omitted). Given the limited application of the *per se* rule, and that Plaintiffs have only attempted to factually distinguish *Eichorn* and have cited no case requiring the *per se* rule's use in the context of a no hire agreement, this Court finds that Defendants' agreement is likely to be reviewed under the rule of reason.

■ Because this Court finds that the case is properly within the rubric of the rule of reason, this Court must examine the proofs Plaintiff proffers to establish injury. Plaintiff offers the declaration of his expert, economist Donald J. Welsch, who proposes to use multiple regression analysis, as well as the "yardstick" method, to project what members of the class would have earned during the class period had these agreements not been in place. Plaintiff offers these initial results to show he will be able to prove "impact" on a classwide basis.

Courts have recognized the validity of both these methods for demonstrating classwide impact. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148–49 (3d Cir.2002). But for impact to be proven on a classwide basis,

"the common proof [must] adequately demonstrate[ ] damage to each individual." *Newton*, 259 F.3d at 180 n. 21. Not only do Plaintiffs have the burden of proving that they can *calculate* the damages allegedly suffered by each class member, but to satisfy the antitrust injury requirement, Plaintiffs must demonstrate that "some damage to each individual" actually occurred. *Bogosian*, 561 F.2d at 454.

Despite the limiting language defining the class as persons "who suffered damages as a result of defendants' illegal conspiracy and violation of the antitrust laws," Plaintiffs do not offer sufficient proof that every individual in the Class has been affected by the alleged antitrust violations. In *Linerboard*, plaintiffs obtained the certification of two classes of purchasers of cardboard products, to pursue claims against manufacturers of linerboard for an alleged conspiracy to reduce supplies in order to raise prices in violation of Section 1 of the Sherman Act. In support of class certification, plaintiffs' expert offered the conclusion that the alleged conspiracy to reduce the supplies of linerboard would have raised prices and "would have impacted all members of the proposed class through higher corrugated sheet prices." *Linerboard*, 305 F.3d at 153–54. The Third Circuit, in affirming the class certification decision, found it compelling that plaintiffs' experts had "effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur such damages." *Id.* at 154–55.

Plaintiff here offers no similar support for his claim of classwide impact, only the naked conclusions of his expert. There are two main conclusions that Plaintiff's expert proffers. First, that his preliminary analysis using the multiple regression model "will show that the class members' compensation levels would have been higher if there had not been any no-hire agreements in the printing inks industry, which result will provide generalized proof that defendants' no-hire agreements 'impacted' the class members." Welsch Decl. at 2. Second, Mr. Welsch theorizes that his preliminary analysis using the yardstick model "indicates that this model

will show that the compensation levels in the yardstick industry were higher than in the printing inks industry ... [t]his result will provide generalized proof that the no-hire agreements 'impacted' the class members." *Id.* at 2–3.

Reading the plain language of Mr. Welsch's declaration, this Court cannot be certain that he is even asserting that his models will show that all class members have suffered antitrust injury. He states that he will likely be able to show that the agreements "impacted the class members," but does not assert that he can show that *all* members of the class suffered antitrust injury. Furthermore, contrary to the support presented in *Linerboard,* Plaintiff's expert offers nothing else to bolster his conclusions. This Court is not convinced that Plaintiff's expert has even claimed, much less shown, that he will be able to prove impact on a classwide basis. Without such proof, this Court would have to take into account a multitude of individual considerations to determine that each purported class member, has, in fact, been injured.

The Third Circuit in *Newton* highlighted this difficulty in the context of securities law, finding in that case "[d]etermining which class members were economically harmed would require an individual analysis into each trade and its alternatives." *Newton,* 259 F.3d at 189. Plaintiffs in *Newton,* who were purchasers of securities listed on the NASDAQ stock exchange, sought damages for the alleged breach of their brokers' duty to execute their desired transactions at the lowest possible prices. To determine whether each of the class members had even been injured, a court would have had to consider the individual transactions of a multitude of individual investors, which would be what the court deemed a "Herculean task." *Id.* at 187. The District Court had found that "whether a class member suffered damages would have to be determined on a trade by trade basis" because "some class members would have suffered damages; while some would not." *Id.* Accordingly, the Third Circuit agreed that such individual questions were overpowering and found class certification inappropriate.

The purported class action before this Court presents a similar challenge. Plaintiff must establish that each class member has, in fact, been injured by the alleged conduct. The types of injury Plaintiff alleges are (1) decreased salaries and (2) deprivation of new job opportunities. In order to prove these types of injury, a number of individual determinations would have to be made. Defendants point out that resolution of each claim would depend on the consideration of several factors; for example, whether the employee's contract was the result of arms length negotiation, whether a covenant not to compete was included in a particular employee's contract; the employee's salary history, educational and other qualifications; the employer's place of business; the employee's willingness to relocate to a distant competitor, and their ability to seek employment in other industries in which their skills could be utilized (e.g., pharmaceuticals, cosmetics).

This Court finds the existence of non-compete provisions in some purported class members' employment contracts especially problematic, because these class members will not be able to prove antitrust injury. Courts have determined that where employees have voluntarily removed themselves from competing in an industry by executing a covenant not to compete, they may not then claim that a defendant's conduct has barred them from competing in the labor market. *See, e.g., McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1377–78 (8th Cir.1983) (finding "fact that [employees] voluntarily withdrew as competitors [meant they] lack 'antitrust injury' "), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1235 (6th Cir.1981) (holding plaintiff's act of voluntarily withdrawing from competition was proof of lack of antitrust injury). Plaintiff counters that these non-compete provisions present individual issues only insofar as they relate to the computation of damages. Pl. Reply Br. at 1, 19. This Court disagrees, and finds that the existence of non-compete provisions in some class members' employment contracts implicates the threshold issue of whether they have suffered antitrust injury at all.

Defendants also assert that employees who were *not* bound by non-compete provisions in their employment contracts cannot prove injury because they never sought employment elsewhere. This factor would have to be analyzed in determining antitrust antitrust injury. Furthermore, Defendants assert that despite the existence of the alleged "no hire" agreements, Defendants *did* hire a number of each other's employees. *See* Defs. Opp. at 5. This belies Plaintiff's assertion that antitrust injury can be established for each class member. If employees were indeed hired by competitors despite the alleged agreements, those employees would not have suffered injury in the form of lack of job mobility and would have to be excluded from the class. This kind of determination, as well as the analysis of the individual employee's employment contracts, would have to be made on an individual employee basis.

Furthermore, Plaintiff's proposed class would presumably include employees whose first jobs in the printing ink industry were with one of the Defendants. This Court is troubled that workers who entered the industry in the first instance, either out of school or from a related field, are included in Plaintiff's class and have therefore allegedly suffered antitrust injury. Plaintiff alleges that Defendants' conduct impacted the labor market for skilled printing ink employees, but this Court cannot understand how someone who willingly entered the market from another field, or out of school, suffered the antitrust injury Plaintiff describes unless, by virtue of his employment with the Defendant, he developed a unique skill set that would be useless anywhere other than with a direct competitor. Plaintiff does not adjust for these considerations. And injury would be even more difficult to establish where a skilled person from another field has begun employment with a Defendant and has freely negotiated his or her own salary and benefits.

Finally, a number of common sense considerations would necessarily factor into whether a class member had indeed been injured. Despite Plaintiff's reliance on an industry-wide wage survey, Defendants point out that a number of factors determined each employee's compensation and benefit levels and a generalized survey cannot account for differences in employee compensation. Some factors that might result in higher or lower than average compensation include the employee's performance history, the company's wage policies and solvency, and how much the employer needed a particular employee at the time he or she was hired. All these factors, Defendants argue, would factor into the calculus of what each employee was paid and what benefits each received.

This Court agrees with Defendants. Plaintiff alleges that several thousand employees are included in the class definition. To determine whether impact exists on a classwide basis would involve analysis of all the factors discussed *supra*. Such a task would indeed be "Herculean" and demonstrates that individual issues of fact predominate over common issues in this case.

### 3. *Damages*

Plaintiffs wish to use the same econometric models they propose for impact to satisfy the damages prong of their antitrust claims. The Third Circuit has held that "separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, [so] such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 817 (1995). This Court finds that because Plaintiff is unable to establish antitrust injury, whether or not he would have satisfied his burden on this prong is irrelevant for purposes of this motion.

### B. Superiority

The second requirement of Rule 23(b)(3) is that the named plaintiffs must demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). When conducting the superiority analysis, a court must consider the following factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Courts should be mindful, too, that litigation of related claims in one forum is generally preferable. *See Ford Motor Co. Ignition Switch,* 174 F.R.D. at 351.

*Inter alia,* Plaintiff argues that the class action mechanism is preferable because class members' claims would be "relatively small." Plaintiff also argues that "the interest by a class member in controlling his or her own separate action is minimal."

Defendants argue that this Court is likely to encounter difficulties in the management of this action on a class basis. Defs. Opp. at 31. They charge that to determine liability and damages, this "Court will have to proceed alleged agreement-by-agreement and class member-by-member to determine whether an antitrust injury even occurred, with individual determinations of each employee's qualifications, willingness to relocate, and the limitations imposed by valid restrictive covenants and/or confidentiality agreements." Defs. Opp. at 2. This Court agrees with this characterization. Having found that Plaintiff's claims are likely to be considered under the rule of reason, a class action is not the superior method of adjudicating Plaintiff's and other employees' claims because there will be little, if any, efficiency in certifying a class, because scores of individual determinations will still have to be made by this Court.

As Plaintiff cannot meet his burden by showing that resolving these claims by class action would be superior to traditional litigation, class certification pursuant to Rule 23(b)(3) is inappropriate.

## V. CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's motion for class certification. An appropriate order is attached.

ORDER

Before this Court is a motion by Plaintiff Joseph Weisfeld to certify a class pursuant to Fed.R.Civ.P. 23. Defendants opposed the motion. Having considered the parties' submissions, and for the reasons stated in the Court's accompanying opinion,

IT IS on this __ day of October 2002,

ORDERED that Plaintiff's motion for class certification is DENIED.