VICTOR MARRERO, United States District Judge
In its Amended Complaint (see Dkt. No. 67), NYU Hospitals Center ("NYU") brings claims for (1) unlawful agreement in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, against all defendants (Count I); (2) violation of Section 303 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. Section 187, against the 1199SEIU United Healthcare Workers East (the "Union") (Count II); and (3) restitution for excessive fund contributions under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Section 1001 et seq., against the 1199SEIU National Benefit Fund for Health and Human Service Employees (the "Fund") (Count III). Defendants the League of Voluntary Hospitals and Homes of New York (the "League"), the Fund, the Union, and the Mount Sinai Hospital, Montefiore Health System, Inc., the New York and Presbyterian Hospital, and Long Island Jewish Medical Center (collectively, the "Hospital Defendants," and together with the League, the Fund, and the Union, "Defendants"), filed motions to dismiss. For the reasons discussed below, the motions are granted as to Count I of the Amended Complaint, and denied as to Counts II and III of the Amended Complaint.
I. FACTUAL BACKGROUND
In its Amended Complaint, NYU alleges that it was, for many years, a member of the League, which negotiated collective bargaining agreements on behalf of NYU and its competitors with the Union, which in turn represents healthcare workers in the metropolitan area. (See Am. Compl. ¶ 2.) NYU voluntarily withdrew from the League on March 28, 2016, but agreed to continue to abide by the collective bargaining agreement ("CBA") then in effect-a 2009 CBA that was modified by a memorandum of agreement ("MOA") in July 2014, and later by a letter agreement in October 2014-until it terminates on September 30, 2018. (See id. ¶¶ 2, 26, 38.) Following the adoption of the MOA, the Fund, the Union, and the League requested that the actuarial firm of Milliman, Inc. ("Milliman") propose contribution rate methodologies for League member hospitals. (See id. ¶ 32.) In addition to proposing such a methodology, the final actuarial report (the "Milliman Report") also proposed a contribution rate for non-League employers that would go into effect the first full month after an employer withdraws from the League. (See id. ¶¶ 35, 37.) NYU argues that the higher, "non-League" contribution rates it has been paying since October 2016 constitute a penalty that is the result of anticompetitive concerted action by the League, the Fund, the Union, and the Hospital Defendants. (See id. ¶ 50.)
*626 In its second claim for relief, NYU asserts that the Union's imposition of the higher, non-League contribution rates on NYU violated Section 303 of the LMRA, 29 U.S.C. Section 187, which makes it unlawful for a labor organization to threaten, coerce, or restrain any person where an objective thereof is to force or require any employer to join an employer organization in violation of Section 8 (b) (4) (ii) (A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Section 158 (b) (4) (ii) (A). (See id. ¶¶ 75, 77.)
NYU's third cause of action is for restitution of excessive fund contributions against the Fund. (See id. ¶¶ 83-89.) In particular, NYU alleges that the Fund's denial of NYU's request to reject the Union's instruction to impose the higher, non-League contribution rates on NYU after its withdrawal from the League constituted a "mistake of law and/or fact" which caused harm redressable under ERISA. (See id. ¶ 85.)
A. DEFENDANTS' PRE-MOTION LETTERS TO DISMISS
By letters dated August 23, 2017, Defendants notified the Court of their intention to move to dismiss the complaint. (See Dkt. Nos. 38-41.) These letters respond to the original complaint, first filed on June 14, 2017 (see"Complaint," Dkt. No. 1), and superseded by the Amended Complaint filed on December 19, 2017. As outlined in more detail below, some of the arguments pressed by Defendants overlap while some are unique to each defendant.
In its August 23, 2017 letter, the League first moves to dismiss NYU's Sherman Act claim on the basis that the non-statutory labor exemption to the antitrust laws bars any such challenge. In particular, the League argues that the conduct at issue falls within the exemption from antitrust scrutiny for collective bargaining agreements between a multiemployer bargaining unit and a union where the agreement is so "intimately related" to wages, hours, and working conditions that the union's successful attempt to obtain the agreement through bona fide, arm's length bargaining in pursuit of its own labor union policies, and not at the behest of or in combination with non-labor groups, falls within the protection of the national labor policy. (See Dkt. No. 39 at 2-3.) Indeed, the League argues that NYU concedes that it is bound by the 2009 CBA, as amended in 2014, and that the CBA itself required the Fund, working with actuaries, to develop a contribution rate methodology to be implemented if approved by the Fund's trustees. (See id. ) According to the League, these rates were in fact developed by the actuaries, approved by the trustees, and subsequently ratified by the Union and the League. (See id. at 3.) Thus, the League argues, NYU's lawsuit merely challenges the Fund's implementation of CBA terms, and so falls squarely within the non-statutory labor exemption.
Second, the League asserts that NYU fails to state a plausible antitrust claim because: (1) there is no allegation that the League or its member hospitals participated in an antitrust conspiracy-merely that the Hospital Defendants "encouraged and acquiesced" in conduct by the Union and the Fund, and that a League executive was "aware of and copied on" correspondence between the Union and the Fund; (2) the conduct complained of was expressly contemplated by the CBA between the parties; and (3) NYU has not adequately alleged antitrust standing because there is no allegation that the asserted conduct injured competition in the allegedly restrained market. (See id. at 4.)
In their August 23, 2017 letter, the Hospital Defendants move to dismiss the Complaint on the bases that (1) this dispute falls squarely within the non-statutory labor *627 exemption; (2) the Complaint does not adequately allege any unlawful agreement involving the Hospital Defendants because there is no allegation that the Hospital Defendants had a role in the decision made by the Fund concerning NYU's contributions after it exited the League; (3) the Complaint does not adequately allege harm to competition because NYU has failed to plead conduct that is "per se" unlawful and NYU does not adequately plead a "rule of reason" claim; and (4) the Complaint does not plausibly allege antitrust injury because NYU's alleged injuries did not result from any restraint on competition. (See Dkt. No. 38 at 3-4.)
In its August 23, 2017 letter, the Fund moves to dismiss the Complaint on two grounds. First, the Fund argues that NYU fails to state a claim against the Fund for unlawful agreement in restraint of trade because (1) NYU's allegations are merely conclusory, and (2) as an employee benefit fund affiliated with a union, which can use its assets only for the benefit of employees, the Fund is exempt from the antitrust laws. (See Dkt. No. 40 at 1-2.) Second, the Fund argues that NYU's claim for restitution of excessive fund contributions is not yet ripe because it depends on a contingent future event that may not happen-namely, that the trustees of the Fund would decide not to reimburse NYU if they were presented with a determination that the contributions were made by a mistake of law or fact. (See id. at 3.)
In its August 23, 2017 letter, the Union first moves to dismiss the Complaint on the ground that NYU has failed to plausibly allege an antitrust conspiracy. In particular, the Union argues that the only allegedly conspiratorial conduct by the Union was a letter sent to the Fund, instructing it to recalculate NYU's contribution rate using the non-League methodology proposed by the Fund's actuaries, and that the Union's alleged encouragement of and acquiescence in the Fund's determination does not amount to an antitrust conspiracy. (See Dkt. No. 41 at 2-3.) Second, the Union argues that its conduct is protected by the non-statutory labor exemption. (See id. at 3-4.) Relatedly, the Union asserts that the question of whether NYU's purported withdrawal from the League was lawful under federal labor law is currently pending before the National Labor Relations Board ("NLRB"), and that resolution of that question could moot the relief requested by NYU here. (See id. at 2 n.1.) Third, the Union argues that NYU has failed to adequately plead that the alleged conduct harms competition. In particular, the Union argues that competition can be harmed only if total, market-wide investments decrease materially, and while NYU pleads in general terms that competition has been harmed because NYU has $25 million less to invest in new facilities, technology, and services, NYU fails to plead allegations suggesting that total investments in healthcare improvements in the market will decrease materially, or at all. (See id. at 4.)
B. NYU'S OPPOSITION
By letters dated September 22, 2017, NYU submitted the proposed Amended Complaint and responded to Defendants' motion to dismiss arguments. (See Dkt. No. 61.)
In response to the Union, NYU argues that (1) it has properly alleged an unlawful agreement (see id. at 2-3); (2) the Union's conduct is not protected by the non-statutory labor exemption[1] (see id. at 3); and (3) NYU has properly alleged harm to competition because it has alleged a per se violation of the antitrust laws (see id. at 4).
*628 NYU also asserts that the Amended Complaint adequately pleads competitive harm. (See id. )
In response to the Hospital Defendants, NYU first argues that it has properly alleged an unlawful agreement, and that the Hospital Defendants are liable for the League's actions because they authorized the League to act as their agent. (See id. at 11-12.) Second, NYU argues that it has properly alleged harm to competition and antitrust injury because it has alleged a per se violation of the antitrust laws. (See id. at 13.)
In response to the League, NYU argues that the Defendants' conduct is not covered by the non-statutory labor exemption. (See id. at 39-40.) First, NYU argues that the challenged conduct is not "intimately related" to wages, hours, and working conditions, nor is it within the scope of traditionally mandatory subjects of collective bargaining; according to NYU, the withdrawal provision "serves no purpose other than to coerce hospital members to remain in the League and to punish those that withdraw." (See id. at 39.) Second, NYU argues that the withdrawal provision serves as a "direct restraint on a business market" by severely impacting NYU's ability to compete in the market for hospital services, by limiting the ability of other League members to withdraw, and by restricting NYU's ability to pursue investments. (See id. )
In response to the Fund, NYU argues that (1) it has stated an antitrust claim against the Fund because the non-statutory labor exemption does not apply to conspiracies between labor groups and non-labor groups (see id. at 47); (2) NYU's restitution claim properly alleges mistakes of fact and law by the Fund in that the withdrawal provision was never incorporated into the CBA between the parties and thus NYU should never have been treated as "[n]on-League" for purposes of the CBA now in force (see id. at 48-49); and (3) NYU's ERISA claim is ripe for review because NYU has adequately pled that the Fund considered and rejected its request for restitution. (See id. at 49.)
C. DEFENDANTS' REPLIES
By letter dated September 29, 2017, the League replied to NYU, arguing that the December 2014 "agreement" among the Defendants that NYU challenges was a document describing the collectively bargained health care rate calculations to which the parties had already agreed in the July 2014 MOA as modified by a collectively bargained amendment in October 2014. (See Dkt. No. 64 at 1.) The League maintains that the challenged benefit rate terms are protected by the non-statutory labor exemption, and if NYU has a remedy, it is under labor not antitrust law. (See id. at 2-3.) Finally, the League asserts that, like its original Complaint, NYU's Amended Complaint (1) fails to allege that Defendants joined an unlawful agreement, and (2) fails to allege facts sufficient to establish antitrust standing. (See id. at 3.)
By letter dated October 1, 2017, the Union responded to NYU. (See Dkt. No. 51.) First, the Union argues that the Amended Complaint, like NYU's original Complaint, fails to allege a conspiracy. In particular, the Union argues that there is no reason why the Fund would seek agreement from the League for a rule relating to the contributions due from any institution leaving or joining the League during the term of the MOA when the Fund was in fact authorized by the MOA to develop and implement such a methodology. (See id. at 2.) Moreover, the Union argues, the Amended Complaint is internally inconsistent in that, for example, the change in NYU's contribution rate cannot both be in reaction to NYU's withdrawal from the League and the result of an alleged agreement *629 reached over a year before NYU's withdrawal. (See id. at 2-3.) Furthermore, the Union maintains that its conduct is protected by the non-statutory labor exemption. (See id. at 3.) Second, the Union argues that NYU fails to adequately allege harm to competition in the market at large. (See id. ) Finally, the Union contends, NYU's claim, new in its Amended Complaint, against the Union under Section 303 of the LMRA fails because NYU's "displeasure" with the application of the Fund's rules regarding contribution rates does not amount to "coercion" or "restraint." (See id. )
By letter dated October 2, 2017, the Hospital Defendants responded to NYU. (See Dkt. No. 63.) First, the Hospital Defendants argue that NYU's Amended Complaint fails to plead that the Hospital Defendants entered into an unlawful agreement. (See id. at 1-2.) In particular, the Hospital Defendants maintain that neither their receipt of emails concerning the calculation of Fund contribution rates nor their alleged acquiescence in the Fund's decision to alter NYU's contribution rate is sufficient to establish unlawful agreement in violation of the Sherman Act. (See id. at 2-3.) Second, the Hospital Defendants argue that they cannot be held liable under an agency theory for the Fund's conduct because the Fund was authorized to act as agent only for the purpose of entering into a collective bargaining agreement, and thus any separate agreement outside the scope of the CBA between the parties would exceed the League's authority. (See id. at 3.) Third, the Hospital Defendants assert that any agreement between the Union and the League (or the Hospital Defendants) is protected by the non-statutory labor exemption. (See id. ) Finally, the Hospital Defendants argue that the Amended Complaint does not adequately allege harm to competition or antitrust injury. (See id. )
By letter dated October 11, 2017, the Fund responded to NYU. (See Dkt. No. 62.) First, the Fund argues that NYU fails to state an antitrust claim against it because NYU's obligation to contribute to the Fund resulted from collective bargaining-to which NYU was a party-and not from any alleged conspiracy in restraint of trade. (See id. at 1-3.) Indeed, the Fund argues, NYU was made aware of the Milliman Report's contribution methodology for employers changing from League to non-League status as early as December 2014 and it did not then bring any challenge in labor arbitration. (See id. at 2-3.) Second, the Fund argues that NYU has still failed to show that its claim for restitution is ripe. (See id. at 3-4.) More specifically, the Fund asserts that under ERISA, the Fund's trustees have a fiduciary duty to collect and hold NYU's contributions, and there is no basis for them to conclude that any have been made pursuant to a mistake of law or fact unless and until NYU prevails in this litigation. (See id. )
D. TELEPHONE CONFERENCE
The Court held a telephone conference on December 11, 2017 during which it heard arguments from the parties and advised the parties that the Amended Complaint does not appear to state an antitrust claim sufficient to survive a motion to dismiss. (See Dkt. Minute entry for 12/11/2017.) The Court permitted the Fund and the Union to make a joint submission on the LMRA and ERISA claims raised in Counts II and III of the Amended Complaint, and permitted NYU to respond to that submission. (See id. )
E. SUPPLEMENTAL BRIEFING ON ERISA AND LMRA
By letter dated December 15, 2017 (the "December 15 Letter"), the Fund and the Union opposed NYU's ERISA and LMRA
*630 claims. (See Dkt. No. 65.) With respect to the ERISA claim, the Fund argues that Section 403 (c) (2) permits, but does not require, an ERISA plan's trustees to reimburse employer contributions when those contributions are made by reason of a mistake of law or fact. (See id. at 1.) The Fund contends that NYU has not sufficiently alleged a mistake of law or fact because it is clear from the Amended Complaint that NYU's contributions at the non-League rates were not a mistake, but rather were "intentional and in accordance with the CBA." (See id. at 2.)
With respect to the LMRA claim, the Union argues that Section 8 (b) (4) of the NLRA applies only to coercion or restraint directed at a "neutral/secondary employer (an employer with whom a union does not have a labor dispute) in order to coerce the neutral employer to pressure the primary employer ... to resolve the primary labor dispute." (Id. at 3.) Because the Amended Complaint does not allege that the Union is pressuring a secondary employer, the Union argues that there is no basis for a Section 303 claim. (See id. ) The Union also argues that even if there were a basis for a Section 303 claim, there is no "coercion" or "restraint": NYU's payment of the non-League contribution rate is merely the application of the required contribution rate under the CBA to which NYU does not dispute that it is a party. (See id. )
By letter dated January 2, 2018 (the "January 2 Letter"), NYU responded to the Fund and the Union's submission on the ERISA and LMRA claims. (See Dkt. No. 69.) First, NYU reargues that its Amended Complaint sufficiently alleges violations of federal antitrust law. (See id. at 1-6.) NYU largely reiterates its arguments from its September 22, 2017 submission (see Dkt. No. 61), and urges that discovery is necessary to reveal whether or not the Milliman Report provision at issue was properly incorporated into the CBA between the parties. (See id. at 4.)
With respect to its ERISA claim, NYU argues that it has sufficiently pled a mistake of fact and law through its allegation that the Milliman Report provision concerning the contribution rate for employers who transferred from League to non-League status was never validly made a part of the CBA between the parties. (See id. at 7.)
With respect to its LMRA claim, NYU argues that the Union is wrong to state that Section 8 (b) (4) (ii) (A) applies only to union conduct directed at neutral, "secondary employers" with whom there is no primary dispute. (See id. at 7-8.) More specifically, NYU contends that the cases cited by the Union address an old version of the statute, and not the current Section 8 (b) (4) (A) which has "never been interpreted as requiring proof of a secondary objective." (See id. at 8.)
By letter dated January 8, 2018, the Fund wrote to point out a purported misstatement of fact set forth by NYU in its January 2 Letter. (See Dkt. No. 68.) In particular, the Fund notes that in the January 2 Letter, NYU claims that it remained a League member for the duration of the existing collective bargaining agreement, but the Amended Complaint refers to a March 28, 2016 letter whereby NYU resigned from the League "effective immediately." (See id. at 1.)
By letter dated January 9, 2018, NYU responded that the March 28, 2016 letter referenced by the Fund "had the narrow purpose of effecting NYU[ ]'s immediate withdrawal of future bargaining authority from the League," but that NYU remains a League member for the duration of the existing CBA. (See Dkt. No. 70 at 1.)
The Court now construes Defendants' letters described above as motions to dismiss *631 the Amended Complaint pursuant to Federal Rule of Civil Procedure 12 (b) (6) (" Rule 12 (b) (6)").
II. ANALYSIS
A. RULE 12 (B) (6) LEGAL STANDARD
Rule 12 (b) (6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (b) (6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955. However, a complaint should be dismissed if the plaintiff has not offered sufficient factual allegations that render the claim facially plausible. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Furthermore, the requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See id. In adjudicating a Rule 12 (b) (6) motion, a district court must confine its consideration " 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (quoting Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) ).
B. ANTITRUST ALLEGATIONS
1. Legal Standard
Section One of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of [interstate] trade or commerce." See 15 U.S.C. § 1. It is clear from Twombly, which addressed the pleading standards for a Section 1 claim to survive a motion to dismiss, that allegations in support of a Section 1 claim "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557, 127 S.Ct. 1955.
Regardless of whether parallel conduct is alleged, "it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.' " In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (alteration in original) (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ). In other words, the complaint must contain enough factual matter "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 545, 127 S.Ct. 1955.
The restraint alleged must be unreasonable either under a "per se" analysis or under the "rule of reason."[2] Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir. 1998). Generally there is a presumption against using the "per se" analysis. See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Per se rules of illegality are appropriate only where the agreement at issue is so "manifestly anticompetitive" that its "pernicious *632 effect on competition and lack of any redeeming virtue [is] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50-51, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (internal quotation marks omitted). Examples of per se unlawful conduct include horizontal and vertical price-fixing, horizontal market division, and certain types of group boycotts. See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133-34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).
2. Relevant Antitrust Allegations
In its Amended Complaint, NYU alleges an unlawful agreement in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, against all Defendants. (See Am. Compl. ¶¶ 56-72.) NYU asserts that it voluntarily withdrew from the League on March 28, 2016, but agreed to continue to abide by the CBA then in effect (a 2009 CBA that was modified twice in 2014) until it terminates on September 30, 2018. (See id. ¶ 2.) NYU concedes that it agreed to the July 21, 2014 MOA modifying the CBA, and to the October 24, 2014 letter agreement (the "2014 Letter Agreement") between the League and the Union that modified the MOA. (See January 2 Letter at 4.) NYU also asserts that Section 6, Paragraph C of the MOA states that the "Fund administration, together with the actuaries, shall develop a practicable contribution methodology, subject to the approval of the Trustees that effectuates" the two schedules listed in the MOA that contained required contribution rates and caps for both League hospitals and League nursing homes. (See Am. Compl. ¶ 31.)
But NYU asserts that the exercise of "incorporating" the Milliman Report into the CBA and then imposing the non-League contribution rate on NYU did not comply with the applicable collective bargaining process and was therefore inappropriate. (See January 2 Letter at 4.) In particular, NYU alleges that while it signed the 2014 Letter Agreement, there was no mention in the 2014 Letter Agreement of incorporating the Milliman Report in its entirety into the CBA. (See id. ) Nonetheless, NYU asserts, the Union and the League created a new version of the CBA that purported to incorporate the entire Milliman Report-a version that was allegedly neither shared with NYU nor ratified in accordance with the League's rules. (See id. )
As outlined in more detail above, the League disputes the sufficiency of NYU's antitrust allegations on the basis that Fund contribution rates are a mandatory subject of collective bargaining, and therefore exempt from antitrust scrutiny under the non-statutory labor exemption. (See generally Dkt. Nos. 39 & 64.)
The Union urges dismissal of the Amended Complaint because the Union's encouragement of and acquiescence in the Fund's determination to change NYU's contribution rate does not amount to an antitrust conspiracy. (See generally Dkt. Nos. 41 & 51.)
Likewise, the Fund argues that NYU fails to state an antitrust claim because NYU's obligation to contribute to the Fund resulted from collective bargaining-to which NYU was a party-and not from any alleged conspiracy in restraint of trade. (See generally Dkt. Nos. 40 & 62.)
The Hospital Defendants argue that the Amended Complaint does not adequately allege any unlawful agreement involving the Hospital Defendants because there is no allegation that they had a role in the decision made by the Fund to adjust NYU's contributions after it exited the League. (See generally Dkt. Nos. 38 & 63.)
*633 3. Antitrust Allegations Against the Hospital Defendants
As a threshold matter, NYU's antitrust claim against the Hospital Defendants is dismissed because the claim is not supported by specific factual averments of participation in the alleged conspiracy. As the Hospital Defendants note, NYU fails to plead non-conclusory allegations sufficient to state a claim to antitrust relief. (See Dkt. No. 38 at 3.) The Amended Complaint says nothing about who at the Hospital Defendants participated in the alleged agreement. Moreover, there is no allegation that the Hospital Defendants had a role in the decision made by the Fund to change NYU's contribution rate after NYU withdrew from the League. Indeed, there is no allegation as to why the Hospital Defendants' assent would even be necessary for the Union and the Fund to alter NYU's contribution rate. The decision to move NYU to the non-League contribution rate was clearly made without NYU's consent, and there is no allegation as to why the other employer hospitals were at that time differently situated to affect NYU's contribution rate.
The only allegations specifically tying the Hospital Defendants to the alleged conspiracy are that they received two separate communications from the Fund in December 2014 which made reference to the Milliman Report's proposal to adjust the contribution rate for League employers who moved to non-League status, and that the Hospital Defendants did not then raise any objection.[3] (See Am. Compl. ¶¶ 39-40.) On the basis of these facts, NYU alleges in general terms that all Defendants "reached a meeting of the minds at around that time that penalty payments should be imposed on withdrawing Hospital League members, although this was never made a formal part of the collective bargaining agreement." (See id. ¶ 40.)
Iqbal's plausibility standard, however, requires more than a "sheer possibility that a defendant has acted unlawfully." See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ). That is not present here on the face of NYU's Amended Complaint as against the Hospital Defendants. Nor are there any specific allegations regarding the Hospital Defendants that are sufficient to state an antitrust claim. See, e.g., In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (affirming dismissal of antitrust claim where complaint lacked "any specification of any particular activities by any particular defendant" (internal citations omitted) ); Hinds Cty. v. Wachovia Bank N.A., 620 F.Supp.2d 499, 518 (S.D.N.Y. 2009) ("[A]llegations that particular employees participated in communications in furtherance of the alleged conspiracy cannot make the conspiracy itself more plausible, when those allegations do not contain any other specific details.").
NYU's antitrust claim against the Hospital Defendants is therefore dismissed.
4. Antitrust Allegations Against All Defendants
NYU alleges that "[b]y imposing the higher 'Non-League' contribution-rate methodology on NYU [ ] for employee benefits, Defendants have entered into and enforced a per se unlawful contract, combination, or conspiracy to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act." (Am. Compl. ¶ 57.)
Generally, there is a presumption against applying the per se rule. See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ; Bogan v. Hodgkins, 166 F.3d 509, 514 (2d Cir. 1999). "The decision to apply the per se rule turns on 'whether the practice facially appears to be *634 one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289-90, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (alteration in original) (quoting Broadcast Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 19-20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ); see also National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 103-04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct.").
As an initial matter, NYU is wrong that "[g]iven the per se nature of the violation of Section 1 of the Sherman Act, allegations with respect to the relevant product market ... are not required." (See Am. Compl. ¶ 61.) In fact, "it is an element of a per se case to describe the relevant market in which we may presume the anticompetitive effect would occur." See, e.g., Bogan, 166 F.3d at 515.
NYU is, however, correct that certain practices are "so obviously anticompetitive that courts consider these to be per se violations of the Sherman Act." See id. at 514. Examples of per se illegal conduct include price fixing, division of markets, tying arrangements, and certain types of group boycotts. See Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). "Courts have been reluctant to expand the categories of per se illegality." Bogan, 166 F.3d at 514.
Neither price fixing, nor division of markets, nor tying arrangements are alleged to be at issue here. Only the group boycott could potentially apply to this case.
The "classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." See Smith v. Pro Football, Inc., 593 F.2d 1173, 1178 (D.C. Cir. 1978). The Supreme Court has held that "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Indeed, the per se rule is "inapplicable" to vertical restraints. See id. at 136, 119 S.Ct. 493. Here, the dismissal of NYU's antitrust claim as against the Hospital Defendants (NYU's direct competitors) prohibits a finding of a group boycott that would be per se unlawful under Section 1 of the Sherman Act.
Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), is instructive. There, an employer was expelled from a wholesale purchasing cooperative without any explanation, notice, or hearing. The Supreme Court found that the "act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect" in part because "[w]holesale purchasing cooperatives must establish and enforce reasonable rules in order to function effectively." See id. at 296, 105 S.Ct. 2613. The same can be said of multiemployer bargaining units. The Court in Wholesale Stationers also found that "[u]nless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." Id. Here, there is no allegation that NYU possesses market power or exclusive access to an element essential to effective competition.
*635 NYU's argument fails for an additional reason. There is no allegation that the multiemployer bargaining unit at issue here as well as the CBA that NYU admits is binding as between the parties amount to a practice that always or almost always tends to restrict competition and decrease output. To the contrary, multiemployer bargaining tends to increase economic efficiency and is in fact widely used in the marketplace. See Brown v. Pro Football, Inc., 518 U.S. 231, 240, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (multiemployer bargaining "plays a significant role in a collective-bargaining process that itself constitutes an important part of the Nation's industrial relations system"); N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, 353 U.S. 87, 95, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (Congress saw multiemployer bargaining as "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining."); see also Charles P. Bonanno Linen Service, Inc. v. N.L.R.B., 454 U.S. 404, 409 n.3, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (multiemployer bargaining benefits both management and labor, by saving bargaining resources, by encouraging development of industry-wide worker benefit programs that smaller employers could not otherwise afford, and by inhibiting employer competition at the workers' expense).
Indeed, significant policy reasons support dismissal of NYU's antitrust claim here. In elaborating the bounds of the non-statutory labor exemption,[4] the Supreme Court has held that "almost any concerted action by employers that touches on a mandatory subject of collective bargaining, no matter how obviously offensive to the policies underlying the Nation's antitrust statutes, should be immune from scrutiny so long as a collective-bargaining process is in place." Brown, 518 U.S. at 259, 116 S.Ct. 2116. The Court further explained the extent to which multiemployer bargaining is a "well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor." Id. at 240, 116 S.Ct. 2116. In that context, the Supreme Court explained the significant policy reasons behind its decision:
[T]o subject the practice [of multiemployer bargaining] to antitrust law is to require antitrust courts to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed-the very result that the implicit labor exemption seeks to avoid. And it is to place in jeopardy some of the potentially beneficial labor-related effects that multiemployer bargaining can achieve.
Id. at 240-41, 116 S.Ct. 2116 ; see also Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (federal labor law's "goals" could "never" be achieved if ordinary anticompetitive effects of collective bargaining were held to violate the antitrust laws).
For the reasons discussed above, the facts NYU alleges here do not fall into the narrow category of conduct that is per se illegal under the antitrust laws, particularly in light of the general presumption against applying the per se rule. On this basis, NYU's antitrust claim is dismissed.
C. ERISA ALLEGATIONS
Under Section 403(c) of ERISA, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing *636 benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan," except that, in the case of a contribution or payment made by an employer to a multiemployer plan by a "mistake of fact or law," the return of such contribution or payment to the employer within six months after the plan administrator determines that the contribution was made by such a mistake is "not prohibit[ed]." 29 U.S.C. § 1103(c).
In its Amended Complaint, NYU argues that the Union's instruction to the Fund to recalculate NYU's contribution rate (to the non-League rate) was "improper and based on a mistake of law and/or fact." (See Am. Compl. ¶ 85.) NYU argues that the basis of this mistake of law or fact was that the Milliman Report provision concerning employers who transferred from League to non-League status was "never validly made a part of the collective bargaining agreement." (See January 2 Letter at 7.) NYU also alleges that the "Fund denied [its request to reject the Union's instruction to recalculate NYU's contribution rate] on or about August 16, 2016, and recalculated the required contribution as instructed by [the Union], thereby adopting the mistake of law and/or fact." (See Am. Compl. ¶ 85.) Therefore, NYU asserts, "any subsequent request by NYU [ ] for a refund would have been futile." (See id. )
In its August 23, 2017 letter motion to dismiss, the Fund disputes that the claim for reimbursement from the Fund is ripe because it depends on a "contingent future event that may not happen at all-namely, that the Trustees would decide not to reimburse NYU if they were presented with a determination that the contributions were made by a mistake of law or fact." (See Dkt. No. 40 at 3.) In its October 11, 2017 letter motion in support of the motion to dismiss, the Fund clarified that there would be "no basis for the Trustees to conclude that any of NYU's contributions have been made pursuant to a mistake of law or fact" unless NYU prevails on its antitrust claim in this litigation. (See Dkt. No. 62 at 3.) The Fund maintains that the terms of the CBA require NYU to contribute to the Fund at the non-League contribution rate, and therefore that there has been no "mistake" of law or fact. (See December 15 Letter at 2.) The Fund suggests that while it does not believe that NYU's contributions at the non-League rate were made pursuant to a mistake of fact or law, if the Court were to determine that there has been such a mistake, the Fund may reconsider whether or not to refund NYU's contributions. (See Dkt. No. 40 at 3.)
The Court of Appeals for the Second Circuit has noted that there is a "limited standard" under which courts may review the administrative acts of pension fund trustees. See Dumac Forestry Servs., Inc. v. Int'l Bhd. of Elec. Workers, 814 F.2d 79, 82 (2d Cir. 1987). "As a general rule federal courts should refrain from interfering with the administration of a pension plan unless its trustee or administrator has acted in an arbitrary or capricious manner." Building Trades Emps. Ass'n v. N.Y. State Teamsters Conference Pension & Ret. Fund, 761 F.2d 115, 117 (2d Cir. 1985). The Court of Appeals has "consistently held that 'the lawful, discretionary acts of a pension committee should not be disturbed, absent a showing of bad faith or arbitrariness.' " Dumac, 814 F.2d at 82 (quoting Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan, 698 F.2d 593, 599 (2d Cir. 1983) ).
Moreover, this "standard of review must be considered in conjunction with the permissive language of section 1103(c)(2)(A)(ii)," which "neither commands nor precludes the payment of refunds,"
*637 and instead, "merely permits the return of contributions mistakenly made." Dumac, 814 F.2d at 82 (internal quotation marks and citation omitted). Indeed, the statute does not say that payments made under a mistake necessarily will be returned. See Teamsters Local 639-Emp. Health Tr. v. Cassidy Trucking, Inc., 646 F.2d 865, 868 (4th Cir. 1981). Nonetheless, the Court of Appeals has held that an employer is entitled to repayment "if it shows that the refusal to repay was arbitrary or capricious and 'the equities favor restitution.' " Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund, 976 F.2d 834, 835 (2d Cir. 1992) (quoting Dumac, 814 F.2d at 82 ).[5]
The Court of Appeals has also held that:
[T]he fund administrators are in the best position to determine whether the equities of a particular case require a refund or setoff, as opposed to courts making that determination under the rubric of a purported federal common law right to restitution or setoff. We therefore leave such decisions to those vested in the first instance by ERISA with the authority and responsibility to make them.
Brown v. Health Care & Ret. Corp. of Am., 25 F.3d 90, 94 n.4 (2d Cir. 1994).
Whether or not the Fund's failure to repay NYU's contributions made at the higher, non-League contribution rate was arbitrary and capricious depends in part upon resolution of whether or not the Milliman Report provision concerning employers who transferred from League to non-League status was validly made a part of the CBA between the parties through the applicable collective bargaining arrangement. But Rule 12(b)(6) is not an appropriate vehicle by which to decide what is fundamentally a factual dispute. See Arden Way Assocs. v. Boesky, 664 F.Supp. 855, 857 (S.D.N.Y. 1987). Therefore, the Fund's motion to dismiss NYU's ERISA claim is denied.
D. LMRA ALLEGATIONS
Section 303 of the LMRA makes it unlawful for any labor organization to engage in conduct prohibited by Section 8(b)(4)(ii)(A) of the NLRA, which in turn makes it an unfair labor practice for a labor organization to threaten, coerce, or restrain any person where an objective thereof is to force or require any employer to join an employer organization. See 29 U.S.C. § 187 ; 29 U.S.C. § 158(b)(4)(ii)(A). In the Amended Complaint, NYU alleges that the purported "penalty instigated by [the Union] and imposed on NYU [ ] by the agreement of all Defendants constitutes unlawful coercion and restraint within the meaning of § 8(b)(4)(ii)." (Am. Compl. ¶ 77.) NYU also alleges that an objective of the Union's conduct has been to "force or require NYU [ ] to rejoin the [ ] League." (See id. ¶ 81.)
In its December 15 Letter, the Union argues that Section 8(b)(4) applies only to "coercion or restraint directed at a neutral/secondary employer (an employer with whom a union does not have a labor dispute) in order to coerce the neutral employer to pressure the primary employer (the one with whom the union has a dispute)
*638 to resolve the primary labor dispute." (See December 15 Letter at 3.) Here, the Union urges, the Amended Complaint does not, and cannot, allege that the Union is pressuring a neutral, secondary employer, but only that the Union is pressuring NYU to resolve the dispute by allegedly forcing it to pay the non-League contribution rates. (See id. ) In the alternative, the Union argues that NYU's LMRA claim must fail because NYU's payment of non-League contribution rates does not constitute coercion or restraint-rather, it is merely the application of the required contribution rate under the terms of the CBA which even NYU admits binds the parties. (See id. )
In the January 2 Letter, NYU disputes the Union's argument that Section 8(b)(4) applies only to union conduct directed at neutral, "secondary employers," asserting instead that the cases cited by the Union address an old version of the NLRA and not Section 8(b)(4)(ii)(A) as it currently exists. (See January 2 Letter at 7 & n.5.) Indeed, NYU asserts that the current version of Section 8(b)(4)(ii)(A) has "never been interpreted as requiring proof of a secondary objective." (See id. at 8.) With respect to coercion, NYU asserts that the non-League contribution rates are "inherently coercive," and that the Union, in a letter to NYU, threatened to work with the League and its members to continue imposing costs on NYU "indefinitely into the future if NYU [ ] didn't rejoin the League." (See id. )
NYU is correct that Section 8(b)(4)(ii)(A) may apply to conduct targeting primary or secondary employers. Under the Landrum-Griffin Act amendments enacted in 1959, Section 8(b)(4)(A) of the NLRA became Section 8(b)(4)(B), and Section 8(e) was added. See National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 614, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Section 8(b)(4)(B) currently contains a proviso stating that nothing contained in clause (B) "shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 158(b)(4)(B). Despite the fact that without the proviso, Section 8(b)(4)(B) could be read to cover primary activity, "the National Labor Relations Board [ ] and the judiciary have construed the statute more narrowly, both before and after the proviso was added, to prohibit only secondary, rather than primary, strikes and picketing." N.L.R.B. v. Enter. Ass'n of Steam, Local Union No. 638, 429 U.S. 507, 510, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) ; see also National Woodwork, 386 U.S. at 620, 87 S.Ct. 1250 ("Congress meant [Sections] 8(e) and 8(b)(4)(B) to prohibit only 'secondary' objectives" and this intent "clearly appears from an examination of the history of congressional action on the subject."). Section 8(b)(4)(A), however, does not contain the same proviso.
But there is support in the case law for the proposition that Section 8(b)(4) of the NLRA in its entirety was designed to address secondary conduct. In National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 666 n.1, 71 S.Ct. 961, 95 L.Ed. 1277 (1951), for example, the Court noted that Section 8(b)(4) has "been referred to by Congress and the courts as the 'secondary boycott section[ ]' of the Act." See Production Workers Union, Local 707 v. N.L.R.B., 793 F.2d 323, 324 (D.C. Cir. 1986) ("Section 8(b)(4) of the National Labor Relations Act ... for decades has been dubbed the 'secondary boycott provision' in scores of judicial opinions, administrative decisions, law review articles, treatises, casebooks, and law school classrooms."); see also Local 761, Int'l Union of Elec, Radio & Mach. Workers v. N.L.R.B., 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961) ("While [Section] 8(b)(4) does not expressly mention 'primary' or 'secondary' disputes, strikes *639 or boycotts, that section often is referred to in the Act's legislative history as one of the Act's 'secondary boycott sections.' " (internal quotation marks omitted) ).
Nonetheless, courts, including in the Second Circuit, have found violations of Section 8(b)(4)(A) without requiring proof of a secondary objective. In Local 812, International Brotherhood of Teamsters v. National Labor Relations Board, 947 F.2d 1034, 1040 (2d Cir. 1991), for example, the Court of Appeals held that "a labor organization violates section 8(b)(4)(A) whenever it engages in conduct with an object of forcing or requiring an employer or self-employed person to remain a member of a union." The Court did not address whether the conduct at issue was "primary" or "secondary" in nature, thus indicating that the distinction was immaterial to a finding of Section 8(b)(4)(A) liability.
Similarly, in Frito-Lay, Inc. v. Local Union No. 137, International Brotherhood of Teamsters, 623 F.2d 1354, 1354 (9th Cir. 1980), the Court of Appeals for the Ninth Circuit found that "substantial evidence supported the district court's finding that the unions' motive in calling the strike was to force the employers into a multiemployer bargaining unit."
Thus, primary activity has been found to be a cognizable harm under Section 8(b)(4)(ii)(A). See N.L.R.B. v. Musicians Union, AFM Local 6, 960 F.2d 842, 845 (9th Cir. 1992) (finding substantial evidence to support the NLRB's conclusion that the Union violated Section 8(b)(4)(ii)(A) by picketing Lewis, a self-employed musician, with the objective of forcing him to join the union); see also Musicians Union, AFM Local 6, 298 N.L.R.B. 740, 741 (1990) ("Section 8(b)(4)(ii)(A) draws no distinction between primary and secondary picketing."). Accordingly, NYU's claim for relief under the LMRA does not fail as a matter of law.
Alternatively, the Union argues for dismissal on the ground that NYU's LMRA claim fails because NYU's payment of the non-League contribution rates does not constitute coercion or restraint, but is instead the application of the required contribution rate under the terms of the CBA between the parties. This argument depends on resolution of the factual question of whether or not the Milliman Report provision at issue was validly made part of the CBA. Factual disputes of this nature are not appropriately decided at the motion to dismiss stage.
For the reasons mentioned above, the Union's motion to dismiss NYU's LMRA claim is denied.
III. ORDER
For the reasons stated above, it is hereby
ORDERED that the motions (Dkt. Nos. 38-41, 51, 62-64) filed by defendants the League of Voluntary Hospitals and Homes of New York, 1199SEIU United Healthcare Workers East, 1199SEIU National Benefit Fund for Health and Human Service Employees, the Mount Sinai Hospital, Montefiore Health System, Inc., the New York and Presbyterian Hospital, and Long Island Jewish Medical Center, to dismiss the Amended Complaint (Dkt. No. 67) of plaintiff NYU Hospitals Center, are GRANTED as to Count I of the Amended Complaint and DENIED as to Counts II and III of the Amended Complaint.
SO ORDERED.

NYU disputes the Union's argument that resolution of the NLRB proceeding would moot the relief NYU is seeking in this lawsuit. (See Dkt. No. 61 at 3.)

A rule of reason claim is not pled in the Amended Complaint.

NYU does not allege that it raised any objection at this time either.

The Court need not reach the non-statutory labor exemption to dismiss NYU's antitrust claim.

It is worth noting that there is some tension between some of the Second Circuit case law on this issue. As the Court noted in Ciminelli, Tuvia Convalescent Center, Inc. v. National Union of Hospital and Health Care Employees, 717 F.2d 726 (2d Cir. 1983), "broadly held that employers have no standing to sue under ERISA even if they have been directly injured and the injuries are within the class of interests that ERISA was intended to protect"; but Dumac Forestry Services, Inc. v. International Brotherhood of Electrical Workers, 814 F.2d 79 (2d Cir. 1987), and Ciminelli both permitted suits by employers for the return of overpayments. See Ciminelli, 976 F.2d at 835 n.1.